Joseph **CERRITO**, Plaintiff,

v.

**TIME, INC.**, Life Magazine, X, Y and Z Corporation, Doe One through Doe Ten, Defendants.

Civ. No. 48152.

United States District Court
N. D. California.

Aug. 13, 1969.

John J. Ardizzone, San Jose, Cal., Jack Wasserman, Washington, D. C., for plaintiff.

Pillsbury, Madison & Sutro, John B. Bates, John A. Sutro, Jr., San Francisco, Cal., Harold Medina, Jr., New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE B. HARRIS, Chief Judge.

This action for libel arises out of a series of articles printed in Life magazine concerning organized crime in the United States. In the first of the articles plaintiff is identified as the head of a Cosa Nostra "family" located in San Jose. Subsequent to the appearance of the articles plaintiff brought this action. The case is currently before the court on defendant's motion for summary judgment which has been briefed, orally argued and submitted.

In support of the motion, it is contended that the articles were protected by the first and fourteenth amendments and that recovery cannot be had unless plaintiff can show that the defendant published false and defamatory material with a malicious intent to injure plaintiff by its falsity. It is further contended that plaintiff cannot, as a matter of law, meet the burden placed upon him to prove actual malice;[1] that therefore summary disposition should be granted to obviate the chilling effect on freedom of press caused by suits such as this.

Plaintiff contends that he is not a public official and did not inject himself into a public controversy and that therefore New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1967), relied upon by defendant are not applicable. Further, that there is an issue of fact as to the truth of the allegations and as to the author's good faith in refusing to reveal his sources and that therefore summary judgment cannot be granted.

New York Times Co. v. Sullivan, supra, held that public officials may not maintain an action for damages for libel concerning the performance of their public duties without showing *actual* malice. This rule was expanded in Curtis Publishing Co. v. Butts, supra, to include public figures as well as public officials. Mr. Justice Harlan, speaking for the court, said:

We consider and would hold that a "public figure" who is not a public of-

ficial may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. (p. 155, 87 S.Ct. p. 1991)

The rationale of the Butts case was applied to plaintiffs who were not themselves public figures but who were involved in areas of proper public interest, in the case of United Medical Laboratories v. Columbia Broadcasting System, 404 F.2d 706, 710 (9th Cir.1968), which held that the fundamental basis for determining whether the partial immunity doctrine exists is "the right of the public to have an interest in the matter involved and its right therefore to know or be informed about it."

There can be no doubt that organized crime is a subject about which the public has an interest and a right to be informed. The vast expenditures of money by all branches of government, both state and federal, into the workings and extent of organized crime indicates the interest of the public, as well as its right to know or be informed.[2] Accordingly, with this predicate established, it is clear that plaintiff must meet the high standard of proof set forth in Curtis Publishing Co. v. Butts, supra.

In order to recover, therefore, plaintiff would have to prove with *"convincing clarity"* that the statements of the publications were made with knowledge that they were false in their alleged im-

1. New York Times v. Sullivan, infra
   Curtis Publishing Co. v. Butts, infra
   Garrison v. Louisiana (1964) 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125
   Rosenblatt v. Baer (1966) 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597
   Time, Inc. v. Hill (1967) 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456
   Beckley Newspapers v. Hanks (1967) 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248
   St. Amant v. Thompson (1968) 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262.

2. The Commission found that any effective attack upon organized crime in this country must have sustained public support. Experience has shown that public awareness of the nature and extent of the problem results in public pressure to get rid of it. In this regard, the Commission recognized the responsibility of the American press to inform the public and stir its conscience to act in the fight against organized crime. The Challenge of Crime in a Free Society: A report by the President's Commission on Law Enforcement and Administration of Justice.

plications against him, or were made with reckless disregard of whether they were false or not. And in order to be entitled to proceed in this respect, plaintiff could be required to show, on proper challenge such as by the motion and showing for summary disposition here, that it had sufficient probative substance to be able litigably to give rise to an issue of fact on whether such malice actually existed or not. United Medical Laboratories v. Columbia Broadcasting System, supra, p. 712.

The evidence before the court substantially is as follows: In 1967, defendant commissioned Sandy Smith to author the articles in question. Mr. Smith was a veteran reporter specializing in the area of organized crime. He had been a crime reporter since 1939 with various newspapers and had specialized in analyzing organized crime since 1951, during which time he had reported both in newspapers and on television. He was thoroughly accredited and a recognized expert in the field. Cf. Curtis Publishing v. Butts, supra (p. 158).

As part of his contract with Life magazine Smith insisted that he not be required to reveal his sources of information. This request was made because of the known and immediate danger to his informants should their names or identity become known. The vengeance wreaked by the Mafia upon informers and potential witnesses is manifest from the record before this court.[3]

Because of the apparent restrictions, Life, having consulted with counsel and being aware of the developing law, went beyond the normal editorial review of the article.

In addition to a careful and in depth review by the editorial staff, Life hired an independent panel of experts to verify Smith's statements. The panel consisted of Robert Blakey, Chief Counsel, United States Senate Subcommittee on Criminal Law and Procedure, formerly in the Organized Crime and Racketeering Section of the Justice Department; Harold Sell, Acting Director of the Chicago Crime Commission; John Shanley, former New York Chief Police Inspector; and Eliot Lumbard, Special Assistant to the Governor of New York for Law Enforcement and an advisor to the Task Force on Organized Crime. These men were retained by defendant as experts on organized crime to review Smith's material, and then to advise defendant whether it was justified in relying on the accuracy of the statements made by Smith.[4]

This committee concluded from the independent knowledge of its members and from the information provided by Smith and confirmed by the committee that Life was justified in believing that plaintiff was a member of the Cosa Nostra and head of the San Jose family. Although some of the material considered by the committee was confidential and could not be disclosed, it did consider statements made at various government conferences on organized crime at which Cerrito was identified as the head of the San Jose family or as a member of Cosa Nostra.[5] It also considered the facts surrounding the Apalachin Conference of the Cosa Nostra, at which plaintiff was allegedly present but escaped arrest.[6] Further reference to plaintiff was found in documents of the President's Task Force on Organized

---

3. See Appendix

4. Deposition of Robert Blakey

5. Ibid at pp. 15–20

6. A report made by the Commissioner of Investigation of the State of New York entitled "Report on the Activities and Associations of Persons Identified as Present at the Residence of Joseph Barbara, Sr., at Apalachin, N. Y., on Novem-

ber 14, 1957, and the Reasons for their Presence" includes the following:
On Nov. 13, 1957, subject in company with J. Cerrito, J. Civello, James Lanza, and Frank DeSimone checked in at the Hotel Casey, Scranton, Pa., as guests of Russell Buffalino. Travelled from Scranton to Apalachin with DeSimone, Buffalino, Civello—and possibly with Lanza and Cerrito.

Crime which identified plaintiff as leader in the San Jose Area.[7] Also considered were newspaper articles identifying plaintiff as a member of Cosa Nostra wanted by Italian Police in connection with organized crime activities.[8]

The experts concluded that based upon the above stated items, including credible information within their own knowledge, and the reputation of Sandy Smith as an expert in the field,[9] that Life was justified in relying upon Smith's statements concerning Cerrito.

■ In response to this affirmative showing plaintiff offers no more than a bare statement that Smith's article should not have been published because of his refusal to reveal his sources; that Smith was irresponsible and inaccurate; that members of the board set up to review the article were prejudiced because of their connections to law enforcement agencies. The affidavit of the plaintiff, of course, denies that he is now or ever was a member of La Cosa Nostra or was otherwise involved in organized crime.

It is clear that plaintiff has not met the standard of "convincing clarity" as required by United Medical Laboratories v. Columbia Broadcasting Co., supra. Plaintiff contends, however, that it can make such a showing if it is allowed to depose Smith and discover his informants, who are claimed to be unreliable.[10]

Plaintiff's argument is not persuasive. The primary issue is whether Life's action in printing the statement concerning plaintiff was malicious and was made with reckless disregard of the truth.

Defendant contends that the identity of Smith's informants is not material to the issue. Defendant further contends that it reasonably relied on Smith's reputation, the review of its editorial staff and editorial counsel, and the conclusion of its specially convened panel of experts in reaching the conclusions that the allegations made in the article were substantially true.

■ The Court finds that said conduct was not highly unreasonable, nor did it constitute an extreme departure from the standards of investigation and reporting ordinarily adhered to by a responsible publisher. Curtis Publishing v. Butts, supra.

Plaintiff has failed to present a shred of evidence which would lead this Court to conclude that defendant's asserted failure in requiring Smith to disclose the identity of informers and other sources was motivated by either malice or reckless disregard.

■■ Summary judgment is an integral part of the constitutional protection afforded defendants in actions such as this. Plaintiff has been purposely given the heavy burden of proving actual malice. Cepeda v. Cowles Magazines and Broadcasting, Inc. (9th Cir.1968), 392 F.2d 417. In order to prove actual malice, plaintiff must make an affirmative showing of facts from which defendant's probable knowledge of falsity may be constitutionally sustained (Thompson v. Evening Star Newspaper Company, 129

---

7. Deposition of Time employees, pp. 15–16

8. Ibid. pp. 37–39

9. Deposition of Robert Blakey, pp. 49–51

10. As part of the discovery, he took the deposition of Sandy Smith in the Southern District of New York. During the course of that deposition Mr. Smith refused to answer plaintiff's questions concerning the identity of his sources of information. It is fair to observe that defendant's effort to depose material witnesses was met with unrelenting resistance. The affidavit of Harold Medina, Jr., counsel for defendant, sets forth defendant's attempts to depose 32 witnesses. Of the 18 individuals that defendant was able to depose, 11 invoked the Fifth Amendment as to all questions except their name and home address. Of the 6 other than plaintiff who did answer, all claimed lack of knowledge or loss of memory. The remainder of the 32 witnesses avoided attempted service or were otherwise unavailable for deposition. It may be observed further that several of these material witnesses are represented by Jack Wasserman, Esq., attorney for plaintiff.

U.S.App.D.C. 299, 394 F.2d 774 [1968]); the mere hope of questioning the credibility of the defendant's witnesses is not sufficient to resist summary judgment (Hurley v. Northwest Publications, Inc., 273 F.Supp. 967, 974 [D.Minn. 1967]). When it has been established, as it has been in this case, that he cannot meet it, the First Amendment makes it incumbent upon the Court to grant defendant's motion for summary judgment. To hold otherwise would emasculate the reportage of organized crime which is regarded as important to its control.[11]

Accordingly, defendant's motion for summary judgment must be, and the same is hereby, granted.

## APPENDIX

Senator McClellan in a speech before the U. S. Senate on organized crime in the United States said:

> The "enforcer's" duty is to maintain organizational integrity by arranging for the maiming and killing of recalcitrant members or *potential witnesses* against the group. J. Edgar Hoover, for example, testified about a "particular case where they kidnaped a man they thought was not to be trusted." He said:

11. For two decades now, since the Attorney General's Conference on Organized Crime in 1950, the Federal effort has slowly increased. Many of the Nation's most notorious racketeers have been imprisoned or deported and many local organized crime business operations have been eliminated. But these successes have not substantially impeded the growth and power of organized criminal syndicates. Not a single one of the 24 Cosa Nostra families has been destroyed. They are more firmly entrenched and more secure than ever before.

It is vitally important that Americans see this alien organization for what it really is—a totalitarian and closed society operating within an open and democratic one. It has succeeded so far because an apathetic public is not aware of the threat it poses to American life. This public apathy has permitted most organized criminals to escape prosecution by corrupting officials, by intimidating witnesses and by terrorizing victims into silence.

> They hung him on a butcher's hook for three days and tortured him until he died. (Italics ours)
>
> Congressional Record S.2631, Mar. 11, 1969

This item was also noted by Mr. Smith in the Life articles in question:

> The subject was William Jackson, a grotesque slugger for the Outfit who weighed well over 350 pounds. Jackson somehow had gotten out of line and had to be dealt with. As faithfully related by an informant, James Torello and Fiore Buccieri were telling John (Jackie) Cerone with some glee how they'd gone about it.
>
> "Jackson was hung up on that meat hook," said Torello. "He was so * * heavy he bent it. He was on that thing three days before he croaked."
>
> Buccieri began to giggle. "Jackie, you shoulda seen the guy. Like an *elephant*, he was, and when Jimmy hit him in the * * * with that electric prod * * *"
>
> Torello interrupted excitedly. "He was floppin' around on that hook, Jackie. We tossed water on him to give the prod a better charge, and he's screamin' * * *"

As a matter of national "public policy," I must warn our citizens that the threat of organized crime cannot be ignored or tolerated any longer. It will not be eliminated by loud voices and good intentions. It will be eliminated by carefully conceived, well-funded and well-executed action plans. Furthermore, our action plans against organized crime must be established on a long-term basis in order to relentlessly pursue the criminal syndicate. This goal will not be easily attained. Over many decades, organized crime has extended its roots deep into American society and they will not be easily extracted. Our success will first depend on the support of our citizens who must be informed of the dangers that organized crime poses. Success also will require the help of Congress and of the State and local governments. Organized Crime—Message from the President of the United States (H.Doc.No. 91–105), Congressional Record April 23, 1969.

The conversation turned animatedly to other methods of dispensing Giancana's brand of justice—except for the revolting subject matter, they might have been men sitting around a bait shop discussing favorite fishing lures. "The stretcher is best," insisted Torello. "Put a guy on it with chains and you can stretch him until his joints pop. * * * Remember the guy that sweat so much he dried out? He was *always* wantin' water, water * * * I think he died of thirst." *Ex. A, Plaintiff's Complaint*