Cathy **GOLDMAN** and Richard **Heckler,**
Plaintiffs,

v.

**TIME, INC.,** et al., Defendants.

Civ. No. 51476.

United States District Court,
N. D. California.

Oct. 18, 1971.

conviction commitment statutes. Cook v. Ciccone (W.D.Mo.) 312 F.Supp. 822.

William Kiriakis, San Francisco, Cal., for plaintiffs.

Pillsbury, Madison & Sutro, John B. Bates, Charles B. Renfrew, John Neylan McBaine, San Francisco, Cal., for defendant Time, Inc.

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GEORGE B. HARRIS, District Judge.

On June 4, 1969, plaintiffs filed a Complaint in the state courts of Califor-

nia seeking damages for invasion of privacy, fraud, negligent misrepresentation, and money had and received. The action was properly removed to this court, and on August 20, 1969, defendant Time, Inc. ("Time") filed its Answer. Time is the only defendant now left in the action.[1]

This action arises from the publication in Life Magazine of certain pictures of and text about plaintiffs concerning their sojourn in caves in the village of Matala on the Island of Crete. The publication in question, dated July 19, 1968, portrays the plaintiffs on its cover under the words, "YOUNG AMERICAN NOMADS ABROAD." To the side of the picture of plaintiffs appears the caption, "Two Californians at home in a cave in Crete."

Beginning on page 20 of said publication there appears an article entitled "CRETE: A STOP IN THE NEW ODYSSEY," along with the subtitle, "A restless generation of U.S. youth roams abroad." The article consists of pictures of people in and about the caves of Matala as well as text about Matala and about the nature and attitudes of those living in the caves at the time. Included is a picture of plaintiffs, both dressed in bathing suits, sitting in front of their cave. Over this picture is the caption, "They keep house in Matala's caves and keep home far away." The text of the article contains some 5,000 words, of which only the following refer directly to plaintiffs:

> Rick Heckler, who was a champion sprinter at San Diego State, took a degree in English and then wondered what on earth it was good for, told me [Reporter Thompson] how it happened with him: "Four of us decided to open a restaurant in California at Big Bear Lake. We found an old place and cleaned it up, fixed it up—I mean from top to bottom—and we got

our liquor license and we were going great. Then one of our partners—a Rhodes Scholar candidate, by the way —got busted for smoking grass. They took away our liquor license and the restaurant folded."

Rick's dream folded, too. So rather than try a new one, he and his girl, Cathy Goldman, 20, left America to wander.

"Are you going back?"

Shrugs. "Maybe," Rick said.[2]

The documents on file herein reveal that the article and photographs in question resulted from communications between David Maness, then Articles Editor of Life Magazine, and Thomas Thompson, then Chief of the Paris Bureau of Life. Prior to his joining the staff of Life Magazine in 1960, Thompson had been City Editor for the Houston Press Newspaper. Thompson became Life Magazine's Entertainment Editor in 1963 and Chief of the Paris Bureau in 1966.

Maness contacted Thompson concerning the feasibility of a story about young Americans who had left home and were wandering through Europe. Thompson's subsequent investigation convinced both men that such an article would be feasible, and so Maness approved the researching of such an article on American youth in Europe and the Middle East. Thompson contacted Denis Cameron, a free-lance photographer who had done photographic work for Life Magazine in the past, and the two began their traveling and research for the intended article. Thompson and Cameron visited, and included references in their article to, American youth in Paris, London, Athens, Crete, and Istanbul.

When Thompson completed the article, he forwarded it to the New York Office of Life Magazine, where Maness edited it. The article was then forwarded to

---

1. Thomas Thompson was never served with process in this action, and on January 29, 1970, this court granted the motion of Golden Gate Magazine Company to dismiss the action as to it.

2. Plaintiff Heckler does not quarrel with the accuracy of the quotation attributed to him, except to say that he was misquoted as to the word "Maybe."

Life Magazine's Managing Editor George P. Hunt for his final publication approval.

During the period he was in Matala, Thompson spoke to most of those who were living in the 20-odd caves available there for occupancy. Thompson interviewed the plaintiffs on three different occasions for a total of 4 to 5 hours. Thompson indicated that he worked for Life Magazine and was then on Crete to do a story about American youth who had left America and were traveling abroad. Plaintiffs were generally cooperative with Thompson and either consented or did not object to the numerous (some 200) photographs taken of them by Cameron. Many of the photographs, including those which appeared in Life Magazine, were posed by plaintiffs with their knowledge and consent.

Plaintiffs now contend that they were given the impression that Thompson was doing an article in the form of a travelog rather than an article on disenchanted American youth with the overtones that such youth were aimless wanderers seeking refuge from America. Plaintiffs state that they never anticipated being identified by name or as a major front-page attraction. Plaintiffs further state that they at all times intended to return to America after their travels abroad (they had been on Crete only two days when first approached by Thompson). Finally, and most germane, plaintiffs object to the light in which the article cast them, claiming that the implied association with drug-users, draft-dodgers and others of social opprobrium subjected them to ridicule, shame, and disgust by their community.

Defendant Time now moves for summary judgment in its favor, contending that its activities were constitutionally protected and that plaintiffs are not entitled to relief herein.

### DISCUSSION

Plaintiffs' Complaint is drawn in eight causes of action, stating four causes of action or theories of recovery on behalf of each plaintiff. Each of such causes of action will be dealt with separately below.

A. *Causes of Action 1 and 5: Invasion of Privacy.*

Causes of action 1 and 5 of plaintiffs' Complaint attempt to set forth a claim based on defendants' invasion of plaintiffs' right to privacy. More specifically, it is alleged that the actions of defendants put plaintiffs in a false light and

> . . . ascribed to each plaintiff and to the people with whom each plaintiff was associating a peculiar and despicable set of beliefs, attitudes and ideas, and a mode of living which would cause each plaintiff to be shunned and avoided by normal members of society . . . . Complaint at 2–3.

According to Dean Prosser, the rubric "invasion of privacy" actually comprises four separate if related torts:

1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

2. Public disclosure of embarrassing private facts about the plaintiff.

3. Publicity which places the plaintiff in a false light in the public eye.

4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness. Prosser on Torts at 837 et seq. (3d ed. 1964); Prosser, "Privacy," 48 Cal.L.Rev. 383, 389 (1960).

Causes of action 1 and 5 clearly forward a theory of recovery based on the "false light" theory. The interest to be protected in "false light" cases is that of the plaintiff's reputation, but in the instant case we are faced with a strong competing interest: freedom of the press and the right of the public to know. As Prosser has summarized this latter right,

> The privilege of giving publicity to news, and other matters of public interest, arises out of the desire and the right of the public to know what is going on in the world, and the freedom of the press and other agencies

of information to tell them. "Privacy," 48 Cal.L.Rev. 383, 412 (1960).

Beginning with the landmark case of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court and lower federal courts have been gradually redefining and extending the umbra of protection afforded to libels alleged to have occurred at the hands of the public media. In *New York Times* the Court held that a public official could not recover damages for an alleged defamatory falsehood concerning his official conduct unless he could prove that the statement against him had been made with actual malice, that is, with the knowledge that it was false or with reckless disregard for whether it was false or not. *Id.* at 279–280, 84 S.Ct. at 710. Moreover, the Court found that such actual malice would have to be shown with "convincing clarity" because of the protection due the constitutional values at stake. *Id.* at 285–286, 84 S.Ct. 710.

The rule of *New York Times* was first extended from "public officials" to "public figures" in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and finally, beginning with Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1966), to matters of "public interest." The Court recognized that,

Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." Thornhill v. Alabama, 310 U.S. 88, 102 [60 S.Ct. 736, 84 L. Ed. 1093]. 385 U.S. at 388, 87 S.Ct. at 542.

▆ It is now unquestioned that the *New York Times* rule, requiring the plaintiff in a libel-type action to show actual malice, includes matters of newsworthiness or public interest, even where the plaintiff is not a public official or public figure. As the Court held recently in Rosenbloom v. Metromedia, 403 U.S. 29, 43–44, 91 S.Ct. 1811, 1819–1820, 29 L.Ed.2d 296 (1971):

If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety. * * * We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous. [Footnotes omitted.]

See also, Cerrito v. Time, Inc., 449 F. 2d 306 (9th Cir. 1971) aff'g 302 F.Supp. 1071 (N.D.Cal.1969); Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 861 (5th Cir. 1970); United Medical Laboratories, Inc. v. Columbia Broadcasting Sys., 404 F.2d 706, 710–711 (9th Cir. 1968), cert. den., 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); Davis v. National Broadcasting Company, 320 F.Supp. 1070, 1072–1073 (E.D.La.1970); Konigsberg v. Time, Inc., 312 F.Supp. 848, 851 (S.D.N.Y. 1970); Cordell v. Detective Publications, Inc., 307 F.Supp. 1212, 1220, (E.D.Tenn. 1968), aff'd, 419 F.2d 989 (6th Cir. 1969); Briscoe v. Reader's Digest Association, Inc., 4 Cal.3d 529, 541, 93 Cal. Rptr. 866, 483 P.2d 34 (1971); Kapellas v. Kofman, 1 Cal.3d 20, 36, 81 Cal.Rptr. 360, 459 P.2d 912 (1969).

▆ The above cases also make clear that "false light" claims are to be treated by the same standard; a plaintiff

cannot avoid the impact of the *New York Times* rule merely by labelling his action as one for invasion of privacy rather than libel. *See* Time, Inc. v. Hill, *supra*; Cordell v. Detective Publications, Inc., *supra*; Briscoe v. Reader's Digest Association, Inc., *supra*; Kapellas v. Kofman, *supra*.

As to causes of action 1 and 5, then, the issues are first, whether the subject matter of the article in question qualifies as being within the broad ambit of newsworthiness or public interest, and second, if it is, can plaintiffs show with convincing clarity that the article and/or accompanying photographs were published with actual malice.

The public interest is at once an expansive yet elusive concept. Plaintiffs take the position that only concrete, specific events can constitute the basis of a story entitled to the protection of newsworthiness. Here, they continue, Life Magazine merely "manufactured" a story where none existed before in order to bolster a pre-conceived idea about youth abroad. Youth, claim the plaintiffs, is simply too broad an issue to qualify as being newsworthy without more being thrown into the pot.

■ We disagree. Certainly discrete events of current interest are entitled to the protection of newsworthiness, but so are matters of more general scope, such as unemployment, the problems of the aged, hospital care, and, as this court noted in Cerrito v. Time, Inc., *supra*, 302 F.Supp. 1071 at 1073, organized crime. The topic of youth traveling abroad is equally general, but equally deserving of being called newsworthy.

■ The California courts have looked to several factors in determining whether a particular incident is newsworthy. Such factors include: (1) the social value of the facts published; (2) the depth of the article's intrusion into ostensibly private affairs; and (3) the extent to which the party voluntarily acceded to a position of public notoriety. Briscoe v. Reader's Digest Association, Inc., *supra*, 4 Cal.3d at 541, 93 Cal.Rptr.

866, 483 P.2d 34; Kapellas v. Kofman, *supra*, 1 Cal.3d at 36, 81 Cal.Rptr. 360, 459 P.2d 912.

■ Applying these three factors, we conclude that the subject matter of the Life Magazine article in question is entitled to the protection of newsworthiness. First, the article does present facts about a significant segment of the American population engaging in activities that would be interesting to many. Second, it cannot be said that the article delved deeply into seemingly private affairs. Relatively little mention was made of plaintiffs and the references to them were not in depth. Speaking physically, plaintiffs have not—and indeed could not—contend that they had a great expectation of privacy on Crete in view of the tourist nature of the activities there and the very openness or public nature of the caves. Third, and finally, it is obvious that plaintiffs did not resist and in fact made themselves readily available for both the text and photographs which eventually appeared in the Life Magazine article.

This court is well aware of the power of the public media to bring virtually any person, even the most insignificant event, into its ambit as "news." In one sense, of course, all news is manufactured, for the public would generally not know of or be interested in matters not brought to its attention by the media. Nonetheless, the right of the public to know, and of the media to tell, is so deeply entrenched in the American conscience that a great deal of latitude must necessarily be afforded the media in its selection and presentation of news.

■ The second issue here concerns the constitutionally required showing of clearly convincing actual malice on the part of the person or persons responsible for publishing the allegedly defamatory article. Such actual malice cannot be found simply from the language of the article alone, Greenbelt Co-op Pub. Assn. v. Bresler, 398 U.S. 6, 10, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), but must amount to the printing of a knowing falsehood

or the printing of such matter with a reckless disregard for whether it is false or not. Reckless disregard is not measured by what a reasonably prudent person would have published or would have investigated before publishing. Rather, there must be sufficient evidence for the conclusion that the party responsible for publication in fact entertained serious doubts as to the truth of the published matter. *See* St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L. Ed.2d 262 (1968).

No such evidence appears. No matter who is deemed responsible for the publication of the article in question, whether Thompson, Hunt or Life Magazine itself,[3] there is no indication whatever that anyone knowingly published a falsehood concerning the plaintiffs or that anyone entertained any serious doubts about the truthfulness of the article in question. Time has filed affidavits on behalf of Thompson, Cameron, Maness, Hunt, and others in the Life Magazine editorial chain, all of whom deny any knowledge of falsehood or any doubt about the veracity of the subject article. Against this, plaintiffs' affidavits merely reiterate the position taken in the Complaint that they were misled, placed in a bad light, and damaged.

Plaintiffs have effectively elected to stand on their pleadings and have offered no proof or facts by which they could possibly hope to show anyone's ac-

tual malice towards them with that degree of convincing clarity required by the cases.

The cases agree that in this situation the bare allegation of malice, standing alone, is not sufficient to withstand a motion for summary judgment. Plaintiffs' mere hope that somehow or other on cross-examination the credibility of defendant's witnesses may be put in issue is simply insufficient. *See* Konigsberg v. Time, Inc., *supra*, 312 F.Supp. at 853; Cerrito v. Time, Inc., *supra*, 302 F.Supp. at 1074; Hurley v. Northwest Publications, Inc., 273 F.Supp. 967, 973–974 (D.Minn.1967), aff'd, 398 F.2d 346 (8th Cir. 1968). *See also* Thompson v. Evening Star Newspaper Company, 129 U.S.App.D.C. 299, 394 F.2d 774, 777 (1968), cert. den., 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968).

For the reasons just given, it is unnecessary to consider whether plaintiffs would be barred from seeking general damages under their claim for invasion of privacy by reason of California Civil Code § 48a.[4]

**· B.** *Causes of Action 2, 3, 6, and 7: Intentional Misrepresentation and Negligent Misrepresentation*

Causes of action 2 and 6 of plaintiff's Complaint seek recovery under the theories of intentional and fraudulent misrepresentation through the allegations that Thompson and others intentionally mis-

---

3. Time contends that actual malice cannot be imputed to Life Magazine. Instead, plaintiffs must show such malice on the part of the agent responsible for publication. Plaintiffs argue that Thompson had such responsibility and that as a result we must look to his state of mind. Time counters that Thompson merely wrote the article in question, but that it was edited by others and that it is to Hunt, Life Magazine's Managing Editor, to whom we must turn to decide the question of actual malice.

Although this question poses an interesting problem, we need not resolve it in view of the conclusion reached above that plaintiffs cannot carry their heavy burden of showing actual malice as to Thompson, Hunt, or Life Magazine.

4. California Civil Code § 48a provides that a plaintiff cannot recover more than special damages in a newspaper libel suit unless a notice of correction and demand therefor be served within twenty days of plaintiff's knowledge of the publication in question. This the plaintiffs did not do. In Briscoe v. Reader's Digest Association, Inc., *supra*, the court found that a "false light" case is equivalent to a libel claim and therefore must meet the *New York Times* test for malice *and* the requirements of Section 48a. It is thus possible that plaintiffs herein would be barred from the recovery of other than special damages under pertinent California law even if they successfully resisted Time's motion for summary judgment as to their "false light" causes of action.

represented the nature of the article to be written and the use to which the photographs in question would be used.

Causes of action 3 and 7 urge recovery based upon alleged negligent misrepresentation.

We agree with the position of Time, that these causes of action do little more than restate plaintiffs' initial "false light" theory in an effort to avoid the thrust of the *New York Times* rule and the consent apparently given by plaintiffs to being interviewed and having their pictures taken. The same result must obtain here as with causes of action 1 and 5 of plaintiffs' Complaint.

C. *Causes of Action 4 and 8: Misappropriation*

Causes of action 4 and 8 of plaintiffs' Complaint are stated as common counts for money had and received, but actually appear to be based on the alleged misappropriation of plaintiffs' names, stories, and likenesses. Plaintiffs do not contend that defendants ever agreed to pay them anything or that they requested such payment. Plaintiffs contend instead that they are now entitled to $1,000,000 because of the use of their names, stories, and likenesses by Life Magazine.

A review of the scattered case authority on this point leads the court to the conclusion that plaintiffs have not stated and cannot state a cause of action based on alleged misappropriation of their names, stories, and/or likenesses. That a publication is deemed "commercial" does not lessen its right to freedom of the press in the reporting of newsworthy matters. *See* Jenkins v. Dell Publishing Company, 251 F.2d 447, 451 (3d Cir. 1958), cert. den., 357 U.S. 921, 78 S.Ct. 1362, 2 L.Ed.2d 1365 (1958); Cordell v. Detective Publications, Inc., *supra*, 307 F.Supp. at 1220.

Here the plaintiffs were photographed and interviewed in concededly public places for an article we consider to be newsworthy. The plaintiffs' photographs were directly related to the text of the article and it cannot be said that the article was a disguised advertisement. Under these circumstances, Time is entitled to the protection of the First Amendment and plaintiffs are not entitled to recover under a theory of misappropriation.

*Conclusion*

Numerous cases cited by Time support the appropriateness of the granting of summary judgment under the facts and circumstances present here. Accordingly, it is the opinion and order of this court that Time's Motion for Summary Judgment be, and the same hereby is, granted.