HAYES v BOOTH NEWSPAPERS, INC

Docket No. 43401. Submitted December 5, 1979, at Lansing.—Decided June 3, 1980.

Plaintiff, William J. Hayes, sued defendant Booth Newspapers, Inc., and defendants Glen Boissonneault, Rudy Palloto, Robert Martin, Richard Childs and Gary Taylor, employees of Booth Newspapers, for libel in the Genesee Circuit Court. The complaint alleged libel in two editorials appearing in the Flint Journal. Defendants moved for summary judgment on the first count. The motion did not specify the grounds upon which it was predicated, nor was it accompanied by supporting affidavits. The court, Ollie B. Bivins, J., granted the motion. A similar motion without supporting affidavits was filed with regard to count two. The court granted that motion, too. Plaintiff appeals by leave granted. *Held:*

1. Failure to object to the absence of affidavits supporting a motion for summary judgment required by court rule precludes appellate review of the issue.

2. The mere allegation of actual malice in a suit for libel of a public figure is not sufficient to defeat a motion for summary judgment for the reason that there exists no genuine issue of material fact. The party defending against such a motion for summary judgment must demonstrate facts which raise the issue of malice.

Affirmed.

1. MOTIONS AND ORDERS — SUMMARY JUDGMENT — AFFIDAVITS — PRESERVING QUESTION — COURT RULES.

Failure to object to the absence of affidavits supporting a motion for summary judgment required by court rule precludes appellate review of the issue (GCR 1963, 117.2[3]).

2. MOTIONS AND ORDERS — SUMMARY JUDGMENT — GENUINE ISSUE OF MATERIAL FACT — MALICE.

The mere allegations of actual malice in a suit for libel of a

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 545, 553.
[2] 73 Am Jur 2d, Summary Judgment § 23.

public figure is not sufficient to defeat a motion for summary judgment for the reason that there exists no genuine issue of material fact; the party defending against such a motion for summary judgment must demonstrate facts which raise the issue of malice.

*Daniel D. Bremer,* for plaintiff on appeal.

*O'Rourke, Goldstein, Joseph & Kelly, P.C.,* for defendants.

Before: DANHOF, C.J., and BEASLEY and CYNAR, JJ.

CYNAR, J. On June 15, 1972, plaintiff filed a two-count complaint for libel. Said complaint was in response to two articles published in the Flint Journal, one of the newspapers in the Booth chain. The articles related to the actions of plaintiff in conducting the defense of one Mandric Strodder, accused of the first-degree murder of a Flint woman in 1970. The opinions of then Chief Justice KAVANAGH and of Justice WILLIAMS in the case of *People v Strodder,* 394 Mich 193; 229 NW2d 318 (1975), *reh den* 395 Mich 902 (1975), recount in part the tragic events which transpired during the course of that trial, presided over by Circuit Court Judge Philip C. Elliott. We note that the parties herein have stipulated that the trial transcript from that case is the only relevant transcript for purposes of this appeal. The stipulation provides as follows:

"NOW COME Plaintiff/Appellant and Defendants/Appellees, by and through their attorneys, and stipulate and agree that this appeal may proceed without a transcript of the oral arguments made when Defendants/Appellees Motions for Summary Judgment were heard. It is further stipulated and agreed that the only relevant transcript in this matter is the transcript of

the trial *People v Strodder* Court of Appeals docket no. 13131."

Count I of plaintiff's complaint addressed itself to an August 15, 1971, editorial appearing in the Flint Journal.[1] Count II was based on an article

---

[1] That editorial, as it appeared in plaintiff's complaint, read as follows:

" 'BAR SHOULD FACE NEED TO POLICE MEMBERS'

"Like our readers, we watched with dismay the progress of the trial of Mandric V. Strodder, 18, who was convicted of the rape-murder of a Flint woman.

"It was not necessary to be a close student of courts and trials to realize that this was a travesty, a mocking of what our judicial system is designed to be.

"Therefore, we are encouraged by the report that Circuit Judge Philip C. Elliott will cite the defense attorney, William J. Hayes, to the State Bar of Michigan.

"Our concern is not merely with this case, as blatant an example as it is, but with the very grave problems it presents.

"Of course, one of these serious problems must be the failure of the system to protect members of society from such tragic affairs as this offense. It is a sad commentary on our attempts to get 'bargain rates' in our penal and mental health programs that this man despite his record and his continuing offenses, had been turned loose just weeks before he committed the crime of which he was convicted.

"But the problem to which we address ourselves at this time is the assault on our judicial process and the need to remove the tarnish from its image.

"The trial was a showcase of many of the ills in our courtrooms. *It included the obvious attempts to involve innocent persons for the purposes of sensationalism; the attempts to muddy the waters by parading witness after witness to the stands when they had nothing relevant about which to testify; the repeated instances in which the defense was not prepared and did not have witnesses on hand.*

"*The scarcely veiled attempts to discredit the court and to trespass beyond the rules of evidence were exceeded only by the obviously irregular activities of a disbarred attorney coaching Hayes and serving as "publicity director" for the defense.*

"*Added to the other offenses was the attempt to use the news agencies to influence the case, including one instance in which Hayes most clearly violated the canons of the bar by appearing on a local television show during the trial and making wild charges about the case.*

"The people of Genesee County should be grateful that Judge Elliott met the challenge of this conduct with a steady restraint which can only do credit to the bench. Furthermore, it is gratifying to know that he recognizes the seriousness of these offenses and is not willing to sit back and be pleased that his tribulations are past.

"One thing that becomes evident from this case is the need for a

printed in the February 26, 1972, issue of the paper. The article was directed at plaintiff's application for payment as Strodder's court-appointed attorney, and contained the following paragraph:

"During the trial Elliott questioned whether Hayes was in possession of his sanity and subsequently a court-appointed psychiatrist said Hayes was mentally incompetent to continue the trial."

reformation of certain rules which will permit the removal from the case of attorneys or others whose disruptive tactics are degrading our courts without raising the question of double jeopardy or mistrial.

"The only way to prevent the growth of such practices and to restore the necessary decorum to our courts is to make it completely —and quickly—unprofitable for attorneys to resort to such tactics in the name of 'defending' the accused.

"It is a myth and a distortion promulgated and advanced by those whose interests it serves to argue that the antics of such attorneys as William Kunstler are 'necessary' to protect individuals from persecution by 'society.'

"There are more than sufficient legal safeguards built into our judicial system to provide a far better defense than open defiance of the necessary rules for court procedure. Furthermore, there are more than enough competent defense attorneys who are not intent upon tearing down the judicial system so that those who are can be safely denied the opportunity.

"Because it is essential to our society, it is certain that some methods of curbing this growing antiprofessionalism among some lawyers will be devised.

"IT IS OUR opinion that the best avenue for arriving at solutions which can effectively end this threat while still doing as much as necessary to protect the rights of the individuals must be within the profession itself through its bar associations.

"If the bar wishes to maintain its privileged position in our society, it bears a grave responsibility to police itself and assume its duties as 'officers of the court'.

"It must overcome its obvious reluctance to correct the trespasses of its fellow members and to punish the trepassers [sic] without waiting for outside pressures to move it to act.

"Any society has a strong will toward self-preservation. Therefore, if the bar does not keep order in its own house, society will feel threatened and will move to do the job in other ways. Most such options would be less satisfactory and all of them would be more dangerous."

The underscoring was done by plaintiff in his original complaint in this matter, the plaintiff contending that the underlined statements were untrue, unfair, and published with malice or a reckless disregard for the truth thereof and for plaintiff's rights, reputation and professional standing and, as such, were libelous per se.

The following day, February 27, 1972, the Journal ran an article which stated that the previous day's story had erroneously reported that plaintiff had been found to be "mentally incompetent", rather than "mentally competent", and that the error was regretted.

Defendants answered plaintiff's complaint and raised the affirmative defenses of: (1) fair comment, under MCL 600.2911; MSA 27A.2911; (2) First Amendment rights of freedom of speech and of the press; (3) truth; and (4) lack ˅of actual malice.

Extensive discovery ensued through late 1974. On January 10, 1975, defendants filed a motion for summary judgment as to Count I, which motion failed to state with specificity the grounds upon which it was predicated. No affidavit accompanied the motion. In his brief in support of his answer in opposition thereto, plaintiff conceded that he was a "public figure" under the *New York Times*[2] standard, at least for purposes of this litigation.

On December 22, 1977,[3] the trial court issued an opinion which held for defendants on the aforementioned motion, and entered summary judgment in favor of defendants on Count I on January 25, 1978.

On June 1, 1978, defendants filed a motion for summary judgment as to Count II of plaintiff's complaint. As was the case with defendants' earlier motion, no supporting affidavit was appended to this motion. Summary judgment for defendants on Count II was entered on August 18, 1978.

[2] *New York Times v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964).

[3] The delay of nearly three years between the filing of defendants' motion and the issuance of the lower court's opinion is unexplained in the record, other than a brief reference to the time required to review the trial transcript of *People v Strodder.*

Plaintiff's application for delayed appeal as to both summary judgments was granted April 30, 1979, by order of this Court.

The Strodder trial was, as aptly stated by plaintiff Hayes during its course, unique in the annals of Michigan law.

Before trial, Hayes interposed a defense of insanity to the charge of first-degree murder, although in the 109 days between his appointment and commencement of trial he had seen defendant only once, and that only a few minutes prior to trial. Defendant initially expressed his displeasure with Hayes, but at some later point the relationship between Hayes and defendant improved to the point where defendant indicated complete satisfaction with Hayes's performance.

Toward the close of the prosecution's case, Hayes demanded that B. James Wright be recalled as a witness to further testify. In response to the court's request for an explanation, Mr. Hayes stated:

"Mr. B. James Wright strangled his wife. Will you get up and testify, sir?"

Hayes instructed the court to listen to him, demanded that Wright be placed under guard because he was dangerous, asked Wright whether he wanted to be advised of his constitutional right against self-incrimination, whether he wanted an attorney, and thereafter put Wright through a cross-examination which included allusions to Wright having murdered his wife. Wright denied the accusations. Hayes then asked to review the contents of the police file in the case. The prosecutor objected to this. *People v Strodder* records Hayes's response and the colloquy that followed.

" 'The procedures are unimportant, I am asking that the whole record in this case be impounded, that no further prosecutions go on in this county, that this court and the prosecutor of this county be immediately suspended from office, and that Mr. Mandric Strodder immediately be set free. He is completely, absolutely innocent of this charge.'

"He refused to explain his actions further, but instead maintained:

" 'I ask that Mr. Strodder be reinstated on his bond. He is willing and has authorized me to say he's willing to compromise this case as follows:

" 'He's willing to live in this society as a free man if the people of the State of Michigan are willing to pick up his expenses for the rest of his natural life. Is that right Mr. Strodder?'

"*The Defendant:* Yes sir.

"Shortly thereafter counsel announced that he did not want to participate 'any further in these proceedings', and answered in the negative when the court asked 'are you going to continue with the defense of this matter?'

" *The Court:* I'm going to order you to continue with the defense of this matter.

" *Mr. Hayes:* We have nothing further to say. Is that right, Mr. Strodder?

" *The Defendant:* Yes, sir, Mr. Hayes. * * *

" *The Court:* Am I correct Mr. Hayes that you're telling me that you are refusing the order of the court to continue with the defense of this matter?

" *Mr. Hayes (to the defendant):* Don't talk about the case any further.' " *People v Strodder, supra,* 205-206.

The next day, in order to proceed with trial, the court appointed co-counsel for defendant, and, after expressing his doubts as to Hayes's sanity, the court ordered a psychiatrist to observe Hayes. Following a week's continuance so that co-counsel could familiarize himself with the case, trial resumed. Thereafter, Hayes excoriated the court repeatedly, and barraged the prosecutor and many

witnesses with a steady stream of vitriol and invective. The episodes in which Hayes made personal attacks on the court were many, although each cannot be recounted in detail.

A sampling of plaintiff's behavior indicates that, on at least three separate occasions, Hayes accused the court and the prosecutor of conferring and colluding on evidentiary rulings. He also charged the court with bias as to all such rulings. Plaintiff claimed that the court was only interested in convicting Mandric Strodder.

Hayes called the prosecutor to the stand as a defense witness. He next spoke to himself aloud while questioning witnesses and claimed that if he spoke loudly enough in doing this so that it could be recorded, the court would call him insane again. He threatened to investigate all participants in the trial and subpoena their criminal records in response to what he deemed traducement by the court of his investigator, Matthew Buder, a disbarred attorney.

Plaintiff later accused the court, the assistant prosecutor trying the case, the victim's husband and the then Chief Genesee County Prosecutor of conspiring to obstruct justice in the Strodder case. He began referring to the judge as Mr. Elliott.

When the prosecutor attempted to object to a defense witness giving opinion testimony without being qualified as an expert, Hayes interrupted. The court remonstrated Hayes, stating:

"Mr. Hayes, when opposing counsel wants to be heard to make an objection, he has a right to be heard."

Hayes responded:

"If he's the Prosecutor."

Hayes next began to insult the intelligence of the court, glibly intimating that the court was unable to follow argument regarding the admissibility of evidence.

Plaintiff then intentionally asked leading questions on direct examination and attempted to impeach his own witnesses. Shortly thereafter, he told the trial judge he was ashamed of him. He admonished the judge that he was not going to be able to pick and choose admissible evidence under "your" rules of evidence.

Hayes charged the court with deliberately attempting to ruin his plans to vacation on Mackinac Island and warned the court that he was leaving for vacation and that the court would have to "put chains on me" to prevent him from doing so.

As trial continued, repeatedly stalled by Hayes's chastising of the court and the prosecutor, he began to refuse to call available witnesses, challenging the court to deny him his right to call witnesses in the order he desired. He did this knowing full well that some of these witnesses were not then available, but had been previously or would be shortly in the future. In one sequence, for four out of five days no defense witnesses were heard, although full days were reserved for trial.

Hayes responded to this charge of delay by stating:

"*Mr. Hayes:* That's right. Look I've tried to cooperate with you, Mister Elliott, and you are—

"*The Court:* Judge Elliott.

"*Mr. Hayes:* Judge Elliott. That the electorate did, not me, I'll tell you.

"*The Court:* That could be.

"*Mr. Hayes:* Never and I hope that electorate never makes the mistake again.

"But regardless, they can confer office, they can't put wisdom on the bench.

"I want to tell you this: I will cooperate, and I have cooperated in every way. I have gone to the war in this case, and I'll go to the war forever in this case. I want it—I do not ever wish you to judge me and my motives, and when you suggest that I would have been so dishonorable as to consider myself before I would consider that man, I want to tell you that it's not true and it will never be true."

Plaintiff continually subpoenaed witnesses for the defense, knowing that they had no possible relevant testimony to give. When certain of these subpoenas were quashed, Hayes had new ones issued and had Buder, his investigator, serve them at all hours of the day and night.

Hayes's indecorous behavior continued when he accused the victim's husband of "planning crimes" as a member of a crime commission in Genesee County. Plaintiff then commenced to refer to proceedings held in chambers by the court as "star chamber" proceedings. He accused the court of calling him a liar. He contended that the court was rushing the case, hurrying up the trial to railroad his client, even though trial began June 15, 1971, and did not end until August 5, 1971, with the court having been in session 29 days during that period. In addition, although the court made repeated entreaties to Hayes to present his witnesses or rest his case, plaintiff continued to appear in court sans witnesses.

Hayes later threatened to put the judge on the stand as a witness and cross-examine him with regard to his "prior record". When the prosecutor moved to have the court give prior approval to any subpoenas issued by defense counsel before the

witness would be required to appear, Hayes retorted:

> "I'll give you notice right now, Judge, if you grant that motion I will tell you I'm advising then Mr. Strodder and myself, we will not participate any further in the proceedings. If we can't investigate and subpoena people, we shall not appear—I will not personally appear."

Near the end of trial, plaintiff informed the judge that he had instituted proceedings in Federal court to remove the case from the trial court. The following day of trial, he told the court that he had filed an interlocutory appeal with this Court to take the case out of the trial court's hands and that the court should delay further proceedings until a decision was reached. The court understandably refused this request.

Some 86 witnesses were called by defense counsel and did in fact testify. As the case drew to a close, Hayes claimed he had 26 more witnesses to subpoena but refused to divulge what, if any, relevant testimony any of these witnesses would give. Upon the prosecution's motion therefor, the court ordered the proofs closed.

Also important is the fact that Hayes voluntarily appeared on television during the course of the Strodder trial and freely discussed the case. In his answers to interrogatories in the within case, as well as in his deposition testimony, Hayes admitted asserting on television that the victim's husband committed the murder.

It should be noted Hayes apologized to the court on several occasions.

> "And I'm truly sorry if I've hurt you personally, I

never intended to do so, and that is my word for whatever that's worth."

Near the end of trial, Hayes again professed regret for his actions:

"Now a final point, I want to apologize to the Court for anything I have done, and I know I've done some things that have been personally offensive to the Court. I did anything and everything I did with my conscience to the best interest of my client as I saw it.

"I do not wish to exonerate myself of some of the misbehavior I know I engaged in; that is, on a number of occasions I was rude to the Court, I did yell and shout, I did say things that I shouldn't have. I apologize to you personally; I really don't mean to do that, and I'm really sorry." *People v Strodder, supra,* 209.

The trial judge, in finding the defendant guilty as charged of first-degree murder, stated:

"I do not have the slightest doubt of his guilt of this murder in the first degree. There is not a speck of evidence in support of the transparent and inherently unbelievable fabrication he recently concocted at the invitation of his lawyer." *People v Strodder, supra,* 209-210.

In its memorandum opinion of December 22, 1977, regarding defendants' motion for summary judgment, the trial court in this case cited liberally from portions of the transcript of the Strodder trial, deciding that when William J. Hayes assumed the defense of Mandric Strodder, his conduct became the subject of fair comment and criticism, no matter how severe or caustic. Criticism goes with the acceptance of the spotlight. The court concluded that the article or publication

must be viewed as a whole and, as such, was substantially true.

Plaintiff submits two questions to be determined on appeal, contending that summary judgment was not supported by affidavits as required by GCR 1963, 117.2(3) and that there is a genuine triable issue of fact as to whether or not the statements published in the Flint Journal were true and whether actual malice was present.

The basis for granting summary judgment under GCR 1963, 117.2(1) is the failure of the plaintiff to state a claim upon which relief can be granted. The basis for granting a summary judgment under GCR 1963, 117.2(3) is that the movant, here the defendants, is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.

Plaintiff indicates in his brief that the orders granting summary judgment are both based upon a written opinion of the trial judge dated December 22, 1977, and that the opinion itself is based in large part upon the transcript of the criminal trial which gave rise to the articles in the Flint Journal. Plaintiff submits that his complaint sets forth a cause of action against defendants under the requirements established in *New York Times v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), for alleging a cause of action by a public figure. Defendants did not contend in their motions for summary judgment that plaintiff failed to state a cause of action. Thus, it is evident that the motions for summary judgment were granted pursuant to GCR 1963, 117.2(3), even though the trial judge did not explicitly so state in either of his opinions or the orders. The defendants state in their brief that it was apparent at the time of the motions for summary judgment and is equally

apparent now that the language complained of constituted commentary on the manner in which the defense in the Strodder trial was conducted by plaintiff‛ William Hayes. That is to say the comments were about events which were matters of record in the trial transcript of the case of *People v Strodder.* Accordingly it was and is defendants' position that the merits of plaintiff's case would and should be decided with reference to the question of whether the transcript supported the commentaries made by the defendants, as described and underscored in Count I of plaintiff's complaint. Put another way, the question is whether the comments concerning the trial were: a) truthful; b) fair editorial comments; c) reporting of judicial proceedings; or, d) not published with "actual malice", as defined in *New York Times v Sullivan, supra,* and its progeny.

Based on what has been submitted to this Court for consideration it can only be concluded the trial court granted the motions for summary judgment of dismissal under GCR 1963, 117.2(3).

Plaintiff, in one of the two questions submitted for this Court's determination, argues that the summary judgments were improperly granted because the motions therefor were not supported by affidavits.

With respect to a motion for summary judgment made under GCR 1963, 117.2(3), GCR 1963, 117.3 provides in relevant portion:

".3 Motion and Proceedings Thereon. A motion based upon subrule 117.2(3) shall be supported by affidavits, and the opposing party prior to the day of hearing may serve opposing affidavits. The affidavits submitted by either party shall be governed by the provisions of subrules 116.4, 116.5, and 116.6. Such affidavits, together with the pleadings, depositions, admissions, and

documentary evidence then filed in the action or submitted by the parties shall be considered by the court at the hearing."

Neither the plaintiff, while acting initially *pro se,* nor, thereafter, retained counsel filed any objection to the motion for summary judgment as to Count I or to the motion for summary judgment as to Count II in the court below, or to first application for leave to appeal, on the basis that defendants' motions for summary judgment were not supported by affidavits.

Summary judgment as to Count I was entered by the trial judge on January 25, 1978, and was approved as to form and content by plaintiff. The circuit judge stated that oral argument was had on the motion and that the granting of the summary judgment of dismissal was based on the court's review of defendants' motion and the briefs in support thereof, of plaintiff's answer and supporting briefs and of the transcripts of various depositions and the Strodder trial.

The stipulation and agreement signed by the parties provides that this appeal may proceed without a transcript of the oral argument made at the hearing on the motions for summary judgment. Further, it also provides that the only relevant transcript in this matter is the trial transcript from *People v Strodder.*

Considering the recitation by the trial judge as to what he relied upon in granting summary judgment, the stipulation and agreement making the Strodder transcript the only relevant transcript in this proceeding, as well as the answers to proffered interrogatories in the within cause, it does not appear to us that the filing of affidavits did or would presently serve an essential function in the disposition of this matter on the merits.

In *DeMare Brothers Construction Co, Inc v Teska,* 49 Mich App 642; 212 NW2d 602 (1973), the Court held that it was reversible error to grant summary judgment pursuant to GCR 1963, 117.2(3) unless the motion for summary judgment was supported by affidavit. It is worth noting that Judge ADAMS in his concurring opinion in the *DeMare Brothers* case questioned the wisdom of a "per se reversible error" rule where the record on appeal demonstrates that the grant of summary judgment was justified although the successful movant failed to file an affidavit in support thereof. However, we need not confront this, for we conclude that plaintiff's failure to raise the affidavit issue at the trial level precludes appellate review of the claimed error. *Hudson v Maher,* 55 Mich App 90, 93; 222 NW2d 47 (1974).

In *New York Times v Sullivan, supra,* the United States Supreme Court held that a public official who sues a news media defendant for defamation must prove that, in publishing a defamatory statement, the defendant acted with "actual malice", *i.e.,* with knowledge of the falsity of the defamatory material or with a reckless disregard for its truth or falsity, before that official may recover damages. The same requirement is held to apply to "public figures" who sue in libel on the basis of alleged printed falsehoods. *Curtis Publishing Co v Butts,* 388 US 130; 87 S Ct 1975; 18 L Ed 2d 1094 (1967).

Where one has "projected himself into the arena of public policy, public controversy and pressing public concern", he is precluded by the constitution from recovering for published nonmalicious defamatory statements of and concerning him. *Pauling v Globe-Democrat Publishing Co,* 362 F2d 188 (CA 8, 1966).

The plaintiff has conceded his status as a public figure for purposes of the instant action. In addition, conceded or not, the facts support a conclusion that plaintiff was a public figure. Hayes, by the manner in which he conducted himself in a public judicial proceeding, invited attention and comment, and did so as well by taking affirmative steps to attract attention when he consented to television as well as to newspaper interviews. Thereby, he thrust himself "to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved". *Gertz v Robert Welch, Inc,* 418 US 323, 345; 94 S Ct 2997; 41 L Ed 2d 789 (1974), *Time, Inc v Firestone,* 424 US 448, 453; 96 S Ct 958; 47 L Ed 2d 154 (1976).

As a public figure in a defamation action where a qualified privilege exists, the First and Fourteenth Amendments preclude recovery absent proof that the defendant published damaging falsehoods with actual malice. *Curtis Publishing Co v Butts, supra, Arber v Stahlin,* 382 Mich 300; 170 NW2d 45 (1969). A qualified privilege to report on events affecting a judicial proceeding arises out of the public's interest in the administration of justice. *Peisner v Detroit Free Press, Inc,* 82 Mich App 153; 266 NW2d 693 (1978).

"Actual malice" here means knowledge of the falsity of the published statements or reckless indifference as to whether they were true or false. Actual malice is to be distinguished from a bad or corrupt motive or some personal spite or desire to injure the plaintiff. *Beckley Newspapers Corp v Hanks,* 389 US 81, 82; 88 S Ct 197; 19 L Ed 2d 248 (1967).

While this Court has previously ruled that the mere allegation of malice is sufficient to state a cause of action for defamation, *Parks v Johnson,*

84 Mich App 162; 269 NW2d 514 (1978), *lv den* 405
Mich 820 (1979), *Brunn v Weiss,* 32 Mich App 428;
188 NW2d 904 (1971), Federal courts have held
that a plaintiff seeking to recover for an alleged
libel must make an affirmative showing of facts
from which defendant's *probable knowledge* of
falsity can be constitutionally sustained. See, *e.g.,*
*Cerrito v Time, Inc,* 302 F Supp 1071, 1075 (ND
Cal, 1969), *aff'd* 449 F2d 306 (CA 9, 1971).

In commenting on the use of the summary
judgment mechanism in defamation actions, the
court in *Cerrito, supra,* reasoned that:

"Summary judgment is an integral part of the consti-
tutional protection afforded defendants in actions such
as this. Plaintiff has purposely been given the heavy
burden of proving actual malice * * *. When it has
been established * * * that he cannot meet it, the First
Amendment makes it incumbent upon the Court to
grant defendant's motion for summary judgment." 302
F Supp 1071, 1075-1076.

Therefore, the mere allegation of actual malice
is not, without more, sufficient to raise a material
issue of fact, particularly where, as here, defenses
of a constitutional dimension are raised.

In order for a public figure to establish actual
malice, that class of plaintiff must prove that the
defendant in fact entertained serious doubts as to
the truth of his publication, at least absent proof
of a knowing falsehood. This standard is but a
reformulation of the "reckless disregard for truth"
prong of the actual malice proof requirement.
*Herbert v Lando,* 441 US 153; 99 S Ct 1635; 60 L
Ed 2d 115 (1979). While *Herbert v Lando, supra,*
was not decided until 1979, the case merely con-
firmed the discovery technique of inquiring into
the editorial processes and the very state of mind

of those responsible for the challenged publication, which practice has been utilized since the Supreme Court decided *New York Times v Sullivan, supra,* in 1964. From the date this action was filed, June 15, 1972, to January 10, 1975, the date the motion for summary judgment on Count I was filed, discovery was engaged in, which included interrogatories as well as depositions. This provided plaintiff with ample opportunity to delve into the editorial processes of defendants.

Plaintiff, when met with a motion for summary judgment, must demonstrate *facts* which raise an issue of malice. In *Durant v Stahlin,* 375 Mich 628; 135 NW2d 392 (1965), our Supreme Court held that:

"When properly challenged, plaintiff must establish that he has a case on the law and that there are some evidentiary proofs to support his allegations as to any material fact." *Id.,* 638.

In *Lawrence v Fox,* 357 Mich 134; 97 NW2d 719 (1959), the Court held that a newspaper, when commenting upon the performance of duties by a public official, was invested with a qualified privilege. *Id.,* 146.

"The showing of malice required for the forfeiture of the privilege is not presumed but is a matter for proof by the plaintiff, and evidence of lack of malice *(e.g.,* source and bases of information) may be introduced to sustain the privilege in the face of attack upon it, as well as in mitigation of damages should the privilege fall." *Id.,* 146-147.

Such rationale is equally applicable where the plaintiff is a public figure, especially when he is also an officer of the court.

Absent *any proof* of actual malice, as that term has meaning within the rubric of the First Amendment, defendant's motion for summary judgment as to Count I was properly granted. Review of the trial transcript convinces us that the publication was fair comment on the judicial proceeding, substantially true and published without actual malice. The factual sufficiency of this count of plaintiff's complaint was tested and failed.

The analysis with respect to the summary judgment granted as to Count II is no different from that offered above. We reach the same conclusion thereon, since the required proof of malice was lacking.

Affirmed. Costs to defendants.