In the

# United States Court of Appeals
## For the Seventh Circuit
_____


Nos. 14-3308, 15-1839

KEVIN B. MCCARTHY, *et al.*,

*Plaintiffs / Counterclaim Defendants-Appellees*,

*and*

LANGSENKAMP FAMILY APOSTOLATE, *et al.*,

*Counterdefendants-Appellees*,

*v.*

PATRICIA ANN FULLER, *et al.*,

*Defendants / Counterplaintiffs-Appellants.*
_____

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-00994-WTL-DML — **William T. Lawrence**, *Judge*.
_____

ARGUED SEPTEMBER 21, 2015 — DECIDED DECEMBER 18, 2015
_____

Before POSNER, WILLIAMS, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This suit, instituted in 2008, grows out of an event in Indiana in 1956: Mary Ephrem, a Catholic Sister of the Congregation of the Sisters of the Precious Blood, claimed to have encountered a series of apparitions of the Virgin Mary, which had told her: "I am Our Lady of America." With support from the Catholic Archbishop of Cincinnati an elaborate program of devotions to Our Lady of America was launched. Our Lady has been credited with healing sick people who appealed to her for a cure, although whether either the apparitions or the cures are authentic has not been determined by the Congregation for the Doctrine of the Faith, the body within the Roman Catholic hierarchy that is responsible for making such determinations.

In the wake of the visions and the Archbishop's support, Sister Ephrem joined with other Sisters of her Congregation in a contemplative cloister—a "strictly cloistered house in the Congregation" created in order "to enable Sisters with a special calling to devote their entire energies to the worship and contemplation of God." Approved in 1963 by Pope Paul VI, the new cloister remained in existence until 1979.

Sister Therese (as Patricia Fuller, the principal defendant in this case, styled herself—we'll explain why we call her "Fuller" rather than "Sister Therese") entered the contemplative cloister in 1965. In 1978 or 1979 its three members (two of them being Fuller and Sister Ephrem) formed a new congregation, which they called the Contemplative Sisters of the Indwelling Trinity. And in 1993 Sister Ephrem founded Our Lady of America Center, dedicated to promoting the devotions to Our Lady. She directed the Center until her death in 2000, whereupon she was succeeded by Fuller.

Sister Ephrem had willed all her property to Fuller, who also took control of the Center and thus obtained control over all property that belonged to either Sister Ephrem or the Center.

Most of the property pertained to the devotions to Our Lady of America and had been created by Sister Ephrem or donated to the Contemplative Sisters or to Our Lady of America Center. Fuller registered trademarks for a variety of the artifacts related to Our Lady of America that had been acquired by the two organizations, including documents such as Sister Ephrem's diary (which Sister Ephrem had copyrighted, along with a song, a painting, and sculpture), medallions, plaques, and a statue of Our Lady.

In 2005 Kevin McCarthy, a lawyer and Catholic layman, and Albert Langsenkamp, who claims to be a Papal Knight of the Holy Sepulchre, met Fuller and committed to help her promote the devotions to Our Lady—spread the word, as it were. The three worked together amicably at first, and in gratitude Fuller gave them the statue and other artifacts of Our Lady. But in 2007 Fuller had a falling out with McCarthy and Langsenkamp that erupted the following year into this bitter, protracted lawsuit, now in its eighth year. Langsenkamp established the Langsenkamp Family Apostolate and McCarthy and Langsenkamp (and the latter's apostolate) claim to be the authentic promoters of devotions to Our Lady of America and to be the lawful owners of all the documents and artifacts accumulated by Fuller and Sister Ephrem.

After the breakup Paul Hartman, a retired postal inspector, came to Fuller's aid by launching a campaign to smear McCarthy's and Langsenkamp's reputations. He emailed leaders of the Catholic Church denouncing McCarthy and Langsenkamp and posted to his blog allegations of their wrongdoings. He emailed to Cardinal Francis George of Chicago a denunciation of Langsenkamp and McCarthy as "two sharks from Indianapolis" who had "hijacked the devotion from Sister Joseph Therese [i.e., Fuller, sometimes also referred to as Sister Mary Joseph Therese] and Our Lady of America Center, all for their personal

profit and gain." And in a typical blog posting by Hartman we read that he "finds it highly unlikely that LANGSENKAMP & MCCARTHY were engaged in prayerful contemplation when they swindled an[] estimated $750,000 from Sister Mary Joseph Therese … . The writer also finds it unlikely that LANGSENKAMP & MCCARTHY were praying as they unlawfully seized control of Sister's website by means of a fraudulent letter to which they forged the name and signature of Sister Joseph Therese. And, certainly, LANGSENKAMP & MCCARTHY were not engaged in prayer when they stole the Archival Statute [he means Statue] of Our Lady of America from Sister Joseph Therese."

McCarthy and Langsenkamp (we can ignore the Langsenkamp Family Apostolate) brought this suit against Fuller and Hartman charging all manner of tortious conduct, including conversion (theft), fraud, and defamation, and also denying having infringed any of Fuller's intellectual property. Fuller and Hartman counterclaimed vigorously, accusing McCarthy and Langsenkamp of similar misdeeds, including theft of the statue, the website of Our Lady of America, and proceeds of the sale of stock owned by Fuller worth $750,000; infringement of copyrights and trademarks that Fuller owned relating to the devotions for Our Lady; and defamation of Fuller by calling her a "fake nun."

The jurisdiction of the federal district court, and of this court on appeal, rests on diversity of citizenship, and also on the Declaratory Judgment Act, 28 U.S.C. § 2201, because McCarthy and Langsenkamp sought a declaration that they had *not* infringed trademarks and copyrights relating to Our Lady. (Those would have been violations of federal law, and so the district court had jurisdiction to issue a declaration that the defendants had not committed them.)

In 2011, midway in this litigation, McCarthy obtained from the Archbishop Secretary of the Congregation for Institutes of Consecrated Life and Societies of Apostolic Life, the branch of the Holy See (the central governing body of the Roman Catholic Church, located in the Vatican) that is responsible for the supervision of what are termed "religious Institutes," a statement that made clear that Fuller was no longer either a nun or a religious sister. (Nuns take solemn vows and are sequestered; that is, they live in monasteries. Religious sisters are not sequestered and take simple vows but are otherwise like nuns.) The statement was that "Miss Patricia Ann Fuller is not a member of any religious Institute, formally recognized by the Catholic Church and therefore must not present herself as a Sister of the Roman Catholic Church."

The following year McCarthy and Langsenkamp submitted to the district court a statement from the Apostolic Nunciature, the Holy See's diplomatic mission to the United States, confirming the authority of the archbishop's declaration and requesting "that the United States of America and its courts accord full faith and credit to" it. McCarthy asked the district judge to take judicial notice of (and thus defer to) the Holy See's ruling on Fuller's status with regard to the Church. His ground was that the federal court, being a secular body, could not reexamine the Holy See's ruling but was required to accept it as authoritative. The judge refused his request on the ground that the jury was the proper body to decide Fuller's status.

That ruling precipitated an interlocutory appeal by McCarthy and Langsenkamp, an appeal that was within our appellate jurisdiction by virtue of the collateral order doctrine. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546–47 (1949). We ruled for the appellants, *McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013), on the ground that a secular court has no authority to take sides on issues of religious doctrine. E.g., *Hosanna-Tabor*

*Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 702–07 (2012). But lest any doubt remain concerning Fuller's status, we asked the Holy See while the interlocutory appeal was pending before us to advise us of her status. It responded in a 51-page amicus curiae brief that analyzed the question in detail and concluded that since leaving the Congregation of the Sisters of the Precious Blood Fuller had not been a member of any religious organization recognized by the Holy See. She is not a member of the Catholic sisterhood or of any Catholic religious order (which is why we refer to her as Fuller rather than as Sister Therese or Sister Mary Joseph Therese).

The Holy See's ruling removed the issue of Fuller's status in the Catholic Church from the litigation. We therefore resolved the interlocutory appeal by ordering the district court to take judicial notice of the Holy See's ruling and not allow the jury to opine on whether Fuller is a nun or a religious sister; she has authoritatively been determined to be neither.

And so the case returned to the district court, which conducted a jury trial that resulted in a verdict in favor of McCarthy and Langsenkamp and against Fuller and Hartman. The plaintiffs were awarded $150,000 in compensatory damages and $200,000 in punitive damages, to be paid, however, just by Hartman because he'd been the principal author of the defamatory statements. The punitive damages award was much smaller than the $1 million that the jury had wanted to award—the court reduced the amount because Indiana prohibits an award of punitive damages that exceeds thrice the compensatory damages awarded. Ind. Code § 34-51-3-4. The jury had awarded Langsenkamp $1,000,000 in punitive damages but only $50,000 in compensatory damages. The judge therefore reduced Langsenkamp's award of punitive damages to $150,000. McCarthy was awarded $100,000 in compensatory damages and $50,000 in punitive damages. The judge also awarded the plain-

tiffs some $295,000 in attorney's fees and sanctions and $281,000 in costs, with these items to be paid by Fuller, Hartman, and their lawyer.

The conduct of the litigation in the district court by the lawyer representing Fuller and Hartman showed, as the district judge explained in granting the request for attorney's fees, a serious and studied disregard for the orderly processes of justice. That disregard has persisted on appeal. Many of the grounds on which Fuller and Hartman seek reversal were waived, are frivolous, or are incomplete, with the important exception of the permanent injunction entered by the district judge, to which we devote the balance of this opinion.

The focus of the injunction was the defamation claims, and its terms were drawn mainly from the following jury instruction:

> The Plaintiffs claim that the following statements were made by the Defendants and were defamatory:
>
> 1.  McCarthy, an attorney in good standing, suggested that Jim Whitta's name be forged on a quit claim deed.
>
> 2.  The Plaintiffs bribed various members of the Clergy.
>
> 3.  McCarthy physically threatened Fuller.
>
> 4.  The plaintiffs stole the Latrobe Statue, the Crucifix, the Plaque, and the Medallions.
>
> 5.  Langsenkamp stole the websites ourladyofamerica.com and ourladyofamerica.org.
>
> 6.  The Plaintiffs stole $750,000 in proceeds from Fuller's Key Bank Stock.
>
> 7.  Langsenkamp was involved in a car chase in which he chased Fuller around Fostoria.

8. The Plaintiffs used the name "Ron Norton" in an inflammatory e-mail exchange that was first published by Hartman on his website, ourladyofamerica.blospot.com.

9. McCarthy, without the knowledge or consent of Fuller, caused a will to be drafted for Fuller in which she left the Devotion to McCarthy.

But the jury was not asked which of these statements had been made by the defendants and, of those statements, which were defamatory. All it was asked to find and all it did find was that the defendants had defamed the plaintiffs and should be ordered to pay damages. The district judge awarded damages, as we have described, and a permanent injunction.

The permanent injunction states:

It is hereby ordered, adjudged and decreed that Defendants Fuller and Hartman … are hereby permanently enjoined from publishing the following statements, as well as any similar statements that contain the same sorts of allegations or inferences, in any manner or forum:

Defendants' statements that[:]

McCarthy suggested that Jim Whitta's name be forged on a quit claim deed;

Plaintiffs bribed various members of the Clergy (including Catholic Priests, Bishops, Archbishops, Cardinals and Popes);

McCarthy physically threatened Fuller or otherwise committed any wrongful act against Fuller;

Plaintiffs are con-men, crooks, forgers, thieves, racketeers, or otherwise stole or converted property from Fuller or engaged in any conspiracy against Fuller with any Catholic clergy, lawyer (canon or civil) or investigator, or any Catholic lay person promoting the devotion;

Plaintiffs stole any statue (including the Latrobe statue), crucifix, plaque, medallions, pins, gold coinage, website (including

the ourladyofamerica.com and ourladyofamerica.org web-sites) and/or proceeds from Fuller's Key Bank Stock;

Langsenkamp was involved in a car chase in which he chased Fuller around Fostoria;

Plaintiffs used the name "Ron Norton" in an inflammatory e-mail exchange that was first published by Hartman at his website, ourladyofamerica.blogspot.com; and

McCarthy, without the knowledge or consent of Fuller, caused a will to be drafted for Fuller in which she left the Devotion to McCarthy.

It is further ordered, adjudged and decreed that Defendant Hartman is hereby ordered to take down the website operated by Hartman at ourladyofamerica.blogspot.com… .

We'll defer for a moment the question, fiercely debated by the adversaries, whether it is ever proper to enjoin speech, and consider first some particulars of the injunction. One is that since the jury didn't indicate specifically which accusations in the jury instruction it found to be defamatory and to have been made by the defendants, the judge had no basis in the jury's verdict for issuing an injunction that tracked the instruction. Nor had he, without making his own factual determinations, authority to enjoin defamatory statements that the jury had not been asked to consider in deciding on its verdict. For example, the judge enjoined Fuller and Hartman from stating that "McCarthy physically threatened Fuller," a defamatory state-ment alleged in one of the jury instructions but not mentioned in the jury's verdict. Also on his own the judge enjoined Fuller and Hartman from saying that the plaintiffs had "committed any wrongful act against Fuller," a proposition that the jury had not even been asked to consider, and from calling the plaintiffs "con-men, crooks, forgers, thieves, racketeers, or [saying that they] otherwise stole or converted property from Fuller or en-gaged in any conspiracy against Fuller with any Catholic clergy,

lawyer (canon or civil) or investigator, or any Catholic lay person promoting the devotion." Those charges, too, had not appeared in the instruction.

The injunction's preamble, moreover, greatly expanded the scope of the injunction by prohibiting "any similar statements [that is, similar to the injunction's specific prohibitions] that contain the same sorts of allegations or inferences, in any manner or forum," as those listed in the body of the injunction. That expansion was improper. An injunction must be specific about the acts that it prohibits. Fed. R. Civ. P. 65(d)(1). How could such vague terms as "similar" and "same sorts" provide guidance to the scope of the injunction? The injunction also ordered Hartman to take down his website, without the judge's having made a finding that *everything* published on the website defamed McCarthy or Langsenkamp (or both).

Had Fuller and Hartman made a timely objection to the entry of the injunction on the ground that the jury had not indicated what defamatory statements it found the defendants to have made, or on the ground that the judge should not have added to the injunction prohibitions not proposed in the jury instruction, or on the ground of the sheer indefiniteness of the injunction, we would vacate it without further ado. Fuller and Hartman missed the deadline for responding to McCarthy's motion for a permanent injunction, however, and ordinarily such a miss would have justified the judge's rejecting any objection to the injunction as untimely. But the injunction in this case had the potential to harm nonparties to the litigation because enjoining speech harms listeners as well as speakers. As this same district judge noted in a previous case, "while Local Rule 7.1 does, as the Defendants note, provide that the '[f]ailure to file a response or reply within the time prescribed may subject the motion to summary ruling,' the Court will not summarily *grant* a motion where, as here, it is apparent from the face of the

motion in question that the movant is not entitled to the relief sought." *Niswander v. Price, Waicukauski & Riley LLC*, No. 1:08-cv-1325-WTL-DML, 2010 WL 3718864, at *3 (S.D. Ind. Sept. 10, 2010); cf. *Wienco, Inc. v. Katahn Associates, Inc.*, 965 F.2d 565, 568 (7th Cir. 1992) (a "motion for summary judgment cannot be granted simply because there is no opposition"). The judge was obligated to consider the public interest despite the waiver of the parties.

The Bill of Rights speaks with its characteristic brevity in prohibiting in the First Amendment "abridging the freedom of speech" and the Supreme Court has interpreted the prohibition to forbid among other things "prior restraints," although there are exceptions such as where national security could be endangered by the speech sought to be enjoined. See *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419–20 (1971); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–23 (1931). "Prior restraint" is just a fancy term for censorship, which means prohibiting speech before the speech is uttered or otherwise disseminated. This has led to a belief in some quarters that defamation, which is a type of speech, can never be enjoined. The problem with such a rule is that it would make an impecunious defamer undeterrable. See *Balboa Island Village Inn, Inc. v. Lemen*, 156 P.3d 339, 351 (Cal. 2007). He would continue defaming the plaintiff, who after discovering that the defamer was judgment proof would cease suing, as he would have nothing to gain from the suit, even if he won a judgment. It is beyond unlikely that Fuller and Hartman can pay what the judge has ordered them to pay the plaintiffs. They will be broke, and if defamation can never be enjoined, they will be free to repeat all their defamatory statements with impunity. McCarthy and Langsenkamp will have no remedy except to sue for damages and obtain another money judgment that they won't be able to collect.

We note in this regard Judge Wellford's opinion in *Loth-schuetz v. Carpenter*, 898 F.2d 1200 (6th Cir. 1990), which announced the court's holding on whether to grant an injunction against defamatory statements. He said he'd "grant a narrow and limited injunction to prohibit [the defendant] from continuing and reiterating the same libelous and defamatory charges he and his company have made against [the plaintiff]. … [A]n injunction is necessary to prevent future injury to [the plaintiff's] personal reputation and business relations. I, however, would limit the application of such injunction to the statements which have been found in this and prior proceedings to be false and libelous." *Id.* at 1208–09 (internal citations omitted). Most courts would agree with Judge Wellford that defamatory statements can be enjoined—see cases cited in *Balboa Island Village Inn, Inc. v. Lemen*, *supra*, 156 P.3d at 347–49—provided that the injunction is no "broader than necessary to provide relief to plaintiff while minimizing the restriction of expression." *Id*. at 352. The Supreme Court, however, has not yet addressed the issue, though it has permitted injunctions preventing other types of scurrilous speech. See, e.g., *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 389–91 (1973) (upholding an order prohibiting advertisements found to constitute gender-based discrimination); *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441–45 (1957) (upholding an injunction that prohibited distributing materials found to be obscene).

But this is not a case in which we have to decide whether defamation can ever be enjoined because, even if it can be, the injunction issued by the district judge cannot be sustained. An injunction against defamatory statements, if permissible at all, must not through careless drafting forbid statements not yet determined to be defamatory, for by doing so it could restrict lawful expression. The injunction that the district judge issued in this case was of that character, owing to its inclusion of vague,

open-ended provisions for which there is no support in the jury verdict or, so far as appears, in the district judge's own evaluation of the evidence. We have no jury findings as to which statements were defamatory, and the plaintiffs didn't even ask the judge to address that absence, so he didn't. As illustrative of the injunction's resulting excessive breadth, notice that it orders Hartman to take down his website, which would prevent him from posting any nondefamatory messages on his blog; it would thus enjoin lawful speech.

An injunction against speech harms not just the speakers but also the listeners (in this case the viewers and readers). "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978); see also *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("the Constitution protects the right to receive information and ideas"). The injunction in this case is so broad and vague that it threatens to silence Fuller and Hartman completely.

So what to do? As we said, the jury found defamation without indicating which charges of defamation, of the nine listed in the jury instruction, they believed had been proved. The judge could have based the injunction on his own assessment of the evidence, since the issuance of an injunction is the responsibility of the trial judge rather than of the jury. But he didn't do that; he accepted the plaintiffs' formulation of the injunction without considering the defendants' response, because it was untimely, even though the preamble to the injunction was a patent violation of the First Amendment.

To conclude, we affirm the entire judgment except the injunction, which we vacate, leaving it to the district judge to decide in the first instance whether to issue a new injunction, one

consistent with the criticisms in this opinion of the injunction he issued.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS

SYKES, *Circuit Judge*, concurring. The only serious issue remaining in this long-running case is the propriety of the permanent injunction entered by the district court as an additional form of relief on the jury's verdict, which found the defendants liable for defamation and awarded damages. The injunction is deeply flawed for all the reasons described by my colleagues: (1) the jury was not asked to identify which of nine possible statements were false and defamatory, so we have no findings to support the specificity requirement for a proper injunction, *see* FED. R. CIV. P. 65(d)(1); (2) the enjoined statements do not even correspond to the statements the plaintiffs *claimed* were defamatory; and (3) the injunction is hopelessly vague and overbroad. It plainly cannot stand.

Unlike my colleagues, however, I would not give the judge an opportunity to correct these errors and try to fashion a narrower injunction on remand. The jury's verdict is too general to support injunctive relief. As the proponents of this remedy, the plaintiffs had the responsibility to propose a special-verdict form that asked the jury to make "statement specific" defamation findings. They did not do so. Accordingly, we have no idea which specific statements the jury found to be false and defamatory; we have only the equivalent of a general verdict that the defendants are liable for defamation. That kind of verdict doesn't contain the necessary factual findings to support the issuance of a permanent injunction.

It's true, as my colleagues note, that the issuance of an injunction is the responsibility of the trial judge, not the jury. *See* Majority Op. at 13. Assuming for argument's sake that the trial judge has the authority to make the missing factual findings himself, I wouldn't allow that opportunity now. The plaintiffs never asked the judge to address this problem either before or

after the jury returned its verdict. Nor have they asked us for a remand to allow the judge to fill the gaps. I see no reason to order this remedy sua sponte.

More fundamentally, the question whether an injunction is permissible *at all* in this context is a sensitive and difficult matter of First Amendment law. A court order permanently enjoining future speech is a prior restraint and as such is presumptively unconstitutional. *Any* prior restraint comes to us "bearing a heavy presumption against its constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and "permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints" because they impose a "true restraint on future speech," *Alexander v. United States*, 509 U.S. 544, 550 (1993). As the Supreme Court explained in its seminal case condemning prior restraints, an injunction against future speech—making any publication of the suppressed speech punishable as contempt—is "the essence of censorship." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931).

Consistent with this bedrock free-speech principle, the traditional rule in defamation law is that "equity does not enjoin a libel or slander[;] … the only remedy for defamation is an action for damages." *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 606 (7th Cir. 2007) (quotation marks omitted); *see also Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001); *Kramer v. Thompson*, 947 F.2d 666, 677 (3d Cir. 1991); *Comm. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987). This rule "has enjoyed nearly two centuries of widespread acceptance at common law." *Kramer*, 947 F.2d at 677; *see also* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 SYRACUSE L.

REV. 157, 167–68 (2007); Michael I. Myerson, *The Neglected History of the Prior Restraint Doctrine: Rediscovering the Link Between the First Amendment and the Separation of Powers*, 34 IND. L. REV. 295, 308–22 (2001).

The Supreme Court has not yet directly addressed whether injunctive relief is a constitutionally permissible remedy for defamation, but the general equitable rule accords with the Court's prior-restraint jurisprudence dating back to *Near*, which invalidated a Minnesota statute that permitted the issuance of temporary and permanent injunctions against persons and organizations engaged in the publication of defamatory newspapers, magazines, or other periodicals. 283 U.S. at 702, 723; *see id.* at 712 ("[S]uppression is accomplished by enjoining publication, and that restraint is the object and effect of the statute.").

An emerging modern trend, however, acknowledges the general rule but allows for the possibility of narrowly tailored permanent injunctive relief as a remedy for defamation as long as the injunction prohibits *only* the repetition of the specific statements found at trial to be false and defamatory. *See Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 308–09 (Ky. 2010); *Balboa Island Vill. Inn, Inc. v. Lemen*, 156 P.3d 339, 347–49 (Cal. 2007); *Sid Dillon Chevrolet v. Sullivan*, 559 N.W.2d 740, 746–47 (Neb. 1997); *Advanced Training Sys., Inc. v. Caswell Equip. Co.*, 352 N.W.2d 1, 11 (Minn. 1984); *Retail Credit Co. v. Russell*, 218 S.E.2d 54, 62–63 (Ga. 1975); *O'Brien v. Univ. Cmty. Tenants Union, Inc.*, 327 N.E.2d 753, 755 (Ohio 1975); *see also Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208–09 (6th Cir. 1990) (Wellford, J., concurring in part and dissenting in part); *id.* (Hull, J., joining Judge Wellford's opinion on this question). These cases ap-

pear to draw general lessons from the Supreme Court's decisions in *Pittsburgh Press Co. v Pittsburgh Commission on Human Relations*, 413 U.S. 376, 389–91 (1973), and *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441–45 (1957). I'm not sure I agree with this modern trend.

*Pittsburgh Press* upheld an order prohibiting a newspaper from organizing its classified advertising section in a way that allowed employment ads to discriminate on the basis of sex — for example, by having separate columns for "Male Help Wanted" and "Female Help Wanted." 413 U.S. at 379–80. In *Kingsley Books* the Court upheld an injunction prohibiting the distribution of a particular booklet found to be obscene after a full trial. 354 U.S. at 445.

*Pittsburgh Press* and *Kingsley Books* arose in distinctive settings that make it difficult to map their holdings onto defamation law. Perhaps most notably, *Pittsburgh Press* did not address an injunction at all, but instead involved a regulatory order issued by a municipal commission that lacked the power to punish by contempt. 413 U.S. at 390 n.14. And the type of speech at issue in *Kingsley* — an obscene booklet — suggests to me that some caution is in order before trying to extrapolate a general rule. Defamation is materially different from obscenity. There's a meaningful distinction between enjoining the distribution of a particular pamphlet once it's been found to be obscene and enjoining a person *in perpetuity* from uttering particular words and phrases. Defamation by its nature is highly contextual. A statement that is defamatory in one circumstance, time, or place might not be defamatory in another circumstance, time, or place. A permanent injunction as a remedy for defamation does not account for constantly changing contextual factors that affect whether the speech is

punishable or protected. If factual circumstances change in a way that affects the defamation calculus, the person enjoined must risk contempt or seek the court's permission to speak. As the Court said emphatically in *Near*, "[t]his is the essence of censorship." 283 U.S. at 713.

The emerging trend, moreover, is far from an inexorable movement toward a new doctrine. In a thoughtful opinion, the Third Circuit predicted that the Pennsylvania Supreme Court would *not* relax the general rule that equity will not enjoin a libel. *Kramer*, 947 F.2d at 677–79. Similarly, the Texas Supreme Court has recently held, also in a thorough and thoughtful opinion, that a permanent injunction as a remedy in a defamation case is an impermissible prior restraint on speech. *See Kinney v. Barnes*, 443 S.W.3d 87, 94–99 (Tex. 2014). *Kinney* was decided as a matter of state constitutional law, but the court noted that the state constitution's free-speech guarantee is governed by First Amendment standards, at least on this particular question. *Id.* at 91–92 ("We know of nothing to suggest that injunctions restricting speech should be judged by a different standard under the state constitution than the First Amendment.") (quotation marks omitted).

Finally, in 2004 the Supreme Court granted certiorari in *Tory v. Cochran* to decide whether a permanent injunction is a constitutionally permissible remedy in a defamation case, "at least when the plaintiff is a public figure." 544 U.S. 734, 736, 737 (2005). But the Court never reached the merits. The plaintiff died after the case was orally argued, so the Court summarily vacated the injunction, which had "lost its underlying rationale." *Id.* at 737–38.

In short, the question whether the First Amendment forbids the issuance of a permanent injunction in a defamation

case is an important one and far from settled. By offering the district court an opportunity to craft a new injunction, my colleagues imply that such a remedy is constitutionally permissible—indeed appropriate in cases of judgment-proof defamers who might not be deterred by a damages award. *See* Majority Op. at 11–12. I cannot join this part of the court's opinion. At the very least, it wrongly implies that a core liberty secured by the First Amendment—the right to be free from prior restraints on speech—does not protect people who lack the means to pay a judgment.

For my part, I see no need to decide the constitutional question now. The injunction is fatally flawed for the other reasons identified by my colleagues, and as explained above, I would not allow the plaintiffs and the court to try again.

Accordingly, I join the court's opinion affirming on all issues except the injunction. I also join the decision to vacate the injunction. But my agreement stops there. I would remand with narrower instructions: The district court should simply issue an amended judgment without the flawed injunction.