*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

MARTHA REDMOND, ARTHUR MCNABB, and
REDMOND FUNERAL HOME,

        Plaintiffs/Counterdefendants-
        Appellees,

v

THERESA HELLER,

        Defendant-Appellant,

and

PAUL HELLER,

        Defendant,

and

DENNIS LEWIS WOLF,

        Defendant-Counterplaintiff.

FOR PUBLICATION
May 28, 2020
9:05 a.m.

No. 347505
Kalamazoo Circuit Court
LC No. 2017-000364-NO

---

MARTHA REDMOND, ARTHUR MCNABB, and
REDMOND FUNERAL HOME,

        Plaintiffs/Counterdefendants-
        Appellees,

v

THERESA HELLER and PAUL HELLER,

        Defendants,

and

No. 347558
Kalamazoo Circuit Court
LC No. 2017-000364-NO

-1-

DENNIS LEWIS WOLF,

Defendant/Counterplaintiff-Appellant.

Before: Murray, C.J., and Meter and K. F. Kelly, JJ.

Murray, C.J.

## I. INTRODUCTION

In these consolidated appeals involving allegedly defamatory publications, defendants, Theresa Heller and Dennis Lewis Wolf, separately appeal by right the trial court's judgment in favor of plaintiffs, Martha Redmond, Arthur McNabb, and Redmond Funeral Home. Specifically, after it granted plaintiffs' motion for partial summary disposition, the trial court entered orders enjoining Theresa and Dennis from publishing certain defamatory statements about Redmond, McNabb, and Redmond Funeral Home. We affirm in part and reverse in part the order granting plaintiffs' motion for partial summary disposition, vacate the permanent injunctions, and remand for further proceedings consistent with this opinion.

## II. BASIC FACTS

The origins of this case arose from the death of Theresa and Dennis's twelve-year-old son, Charles Wolf, in July 2015. The medical examiner's office released Charles's body to McNabb of Redmond Funeral Home on July 28, 2015. McNabb testified that he picked up Charles's body with another staffer from Redmond Funeral Home, Shawn Winfield, and transported it to the funeral home. Redmond, owner of Redmond Funeral Home, was arranging Charles's funeral with Theresa's parents when Charles's body arrived. Craig Daily embalmed and washed the body, and then McNabb and Winfield dressed and prepared the body for viewing. The visitation and funeral occurred on July 31, 2015. It is undisputed that McNabb did not work Charles' visitation or funeral because he was working at a funeral at another location.

After Theresa discovered what she considered to be the "outright lies" involved with the investigation into her son's death, she decided to investigate every name associated with the handling of her son's body. She obtained documents from the coroner's office and discovered that McNabb signed for her son's remains, and subsequently discovered that McNabb was a convicted sex offender. Theresa called Redmond in the fall of 2015, to warn her about McNabb, and according to Theresa, Redmond lied, and said that she did not know that McNabb was a sex offender.

Police reports associated with McNabb's conviction show that McNabb met a 15-year-old high school student at a computer game store. McNabb admitted that he purchased items for the teen, and the teen told an investigating officer that McNabb performed oral sex on him. The reports also suggest that McNabb engaged in grooming behavior, as a witness described McNabb as repeatedly hanging out at an Arby's restaurant, and interacting with a teen. McNabb was convicted

of two counts of third-degree criminal sexual conduct, MCL 750.520d, and was sentenced to prison.

After his conviction, the Board of Examiners in Mortuary Science Report revoked McNabb's license in November 2007, but the Board reinstated his license in October 2015. At a meeting held in November 2015, Redmond Funeral Home's board of directors appointed McNabb as the funeral director for one of its branch locations.

In June 2016, Theresa e-mailed Redmond, and asked for information about her son's funeral. After receiving a response, she asked for information about the specific time that her son's body arrived at the funeral home, but according to Redmond, she did not keep records of arrival times. In that same month, Paul Heller—Theresa's brother—posted an Internet blog entry discussing McNabb, implying that there was a conspiracy of sex predators involved with his nephew's body. He wrote that McNabb was a "pedophile" and "child rapist who had kiddie porn on his computer as well, all of which got him sent to prison for six and a half years." He further wrote: "Who is to say that anything untoward happened? Who is to say anything didn't? Where does the benefit of the doubt lie? You decide." He then wrote that McNabb was not one of "WMed's pedophiles," but that he picked up the body, and it was a "strange coincidence" that another man from "WMed" had been accused of sexual misconduct, and his name also appeared on documents associated with Charles's body.

In November 2016, Redmond Funeral Home's lawyer sent Theresa a letter, noting that Theresa had contacted the Paw Paw State Police Post no fewer than 37 times, had been seen driving by the funeral home on several occasions, and had been posting false claims on the Internet. He demanded that she cease and desist all contact with or regarding Redmond Funeral Home. The following month Theresa was again in contact with the Michigan State Police. She wrote to an officer that she had spoken with another local funeral director, who told her that McNabb was the "worst of the worst." That same month she also filed a complaint against Redmond Funeral Home with the Department of Licensing and Regulatory Affairs (LARA).

Theresa also posted messages on Facebook in December 2016, describing McNabb as a "sick pedophile" who had "violent child porn." She wrote that Redmond's lawyers were trying to intimidate her, and prevent her from exercising her First Amendment rights, and noted that the funeral home had two locations, one in Kalamazoo and one in Parchment. Theresa also noted that the funeral home catered to Catholic churches, and that she was trying to get the word out "about the pedophile that my poor son's body was alone with for three days at REDMOND FUNERAL HOME IN KALAMAZOO." She also wrote that the "perv is Arthur McNabb who raped a boy in Paw Paw and served six years in prison." She wrote that Redmond helped McNabb get his license back, and that it was Theresa's "mission" to make sure that no other child's body passed "through this monster's hands." She then posted a link to McNabb's sex offender registry page, and asked everyone to get the word out about the funeral home and McNabb. She also identified Redmond's law firm, and opined that they did not have any problem "covering up for pedophiles."

Theresa made additional statements against Redmond and McNabb in another post:

It is Arthur McNabb. This is a danger because he had moved from one small town to another all over [southwest] Michigan before he was caught in Paw

Paw at the age of 38. He hunts at fast food places, video gaming stores, and funeral homes. This is thanks to MARTHA REDMOND, who ruined her family name by hiring this pedophile on the cheap. She lied to me, and not only my son but his cousins and all his friends were exposed to this pervert at Charlie's funeral. When Charlie's father and I objected, she lied to us, assaulted Charlie's father, and sicced [sic] her brother's law firm, LEWIS REED AND ALLEN, on me. This, after losing my precious little boy.

In March 2017, Theresa filed a complaint against Redmond Funeral Home with the Better Business Bureau.

Throughout the spring and summer of 2017, Theresa continued to post statements about defendants on the Internet. For example, in an April 2017 post to Facebook, Theresa wrote that McNabb "served six years in prison for raping boys he picked from grieving families." In July 2017, she made a Facebook post in which she identified McNabb's home address, and stated that his "preferred victims"—present tense—were "young teenage boys." In another post, Theresa stated that the Board reinstated McNabb's license because, in its view, his inappropriate relationship had nothing to do with his status as a funeral director. She wrote immediately after: "What? He didn't sodomize his customers['] children? Some of your kids were there at Charlie's Funeral. How does that make you feel?" In an August 2017 post, Theresa again warned that McNabb "targets teenage boys who like video games and nice shirts."

By August 2017, plaintiffs had seen enough, and sued Theresa, Dennis, and Paul. They alleged that Theresa had engaged in threatening and intimidating behavior, which included driving past the funeral home slowly, and posting false messages to social media. McNabb alleged under Count I that each defendant violated MCL 28.730 by using the sex offender registry to injure, harass, or commit a crime against an individual named in the registry. Plaintiffs alleged under Count II that each defendant engaged in business defamation, which harmed their business interests, while under Count III plaintiffs alleged that each defendant invaded each plaintiff's privacy by disseminating information that put them in a false light. Under Count IV, plaintiffs alleged intentional infliction of emotional distress, harassment, stalking, and unconsented contact, which they claimed violated MCL 600.2954 and MCL 750.411h. For Count V, Redmond and McNabb alleged that each defendant posted false and defamatory statements that amounted to defamation per se, and harmed them. In a final claim, Count VI, plaintiffs alleged that each defendant had intentionally caused them emotional distress. Plaintiffs asked the trial court to award damages and equitable relief in the form of an injunction against further defamatory postings.

Plaintiffs also asked the trial court to enter a temporary restraining order, and to show cause why a preliminary injunction should not be entered to prohibit defendants from continuing to post false statements. The trial court entered the temporary restraining order on August 29, 2017, and after a brief hearing, a preliminary injunction. The preliminary injunction ordered, in relevant part, that Theresa and Paul were "restrained from speaking, delivering, publishing, emailing or disseminating information in any manner regarding Arthur McNabb's sex offender status, his address and employment status to anyone anywhere."

Theresa quickly moved for summary disposition on the ground that all of the claims against her were barred by the one-year statute of limitations. She noted that plaintiffs alleged that the defamatory statements were part of a "campaign" that began in June and July 2016. Because plaintiffs did not bring suit until August 2017, she argued that all of plaintiffs' claims were untimely. She also argued that Count I had to be dismissed because the cited statute, MCL 28.730, did not apply to defendants, and so plaintiffs failed to state a claim upon which relief could be granted.

The trial court determined that the period of limitations applied separately to each defamatory statement. The court also noted that Theresa had not agreed to dismiss the claim against Paul and, for that reason, it declined to dismiss the defamation claim against him at that time. It also concluded that there were no grounds for dismissing the claims under MCR 2.116(C)(8), and it denied Theresa's motion.

Plaintiffs subsequently moved to amend their complaint. They alleged that Theresa had made another complaint to LARA, and made false statements within that complaint, and moved to add a count of abuse of process premised on those false allegations. In the LARA complaint, Theresa referred to McNabb as the "convicted gay pedophile," and alleged that he had "access to my son's body for the following three days." She further alleged that there was "now another victim" that has been "alleged to state police, a grieving boy that the pedophile had been 'counseling.'" Plaintiffs separately moved to have Theresa show cause why she should not be held in contempt for failing to remove her Facebook posts as directed by the trial court in its preliminary injunctions.

The trial court held a combined hearing on the motions and granted leave to amend, but was not convinced that Theresa had knowingly violated its order. Accordingly, it did not find her in contempt. Plaintiffs amended their complaint to include a claim for abuse of process under Count VII.

Plaintiffs subsequently moved for partial summary disposition under MCR 2.116(C)(10). They argued that Theresa's actions went far beyond merely reposting or forwarding information from the sex offender registry—she added that McNabb was a pedophile, and described him as putting children at risk and hunting children, implying that he was currently molesting children. Plaintiffs also argued that Theresa falsely stated that the children who attended Charles's funeral were exposed to McNabb, as the undisputed evidence showed that he was not at the visitation or funeral. She had, in plaintiffs' opinion, sounded an alarm about McNabb, which caused him to fear for his safety.

In addition, plaintiffs stated an intention to dismiss their claims for monetary relief should the court agree that there was no genuine issue as to any material fact that they were entitled to a permanent injunction, as Theresa's statements were defamatory per se, and were harming plaintiffs' goodwill. Because Theresa demonstrated that she would continue to harass plaintiffs

by posting false statements along with McNabb's registry information, they sought a permanent injunction against her continued harassing behavior.[1]

In response to plaintiffs' motion for partial summary disposition, Theresa argued that plaintiffs failed to identify and show that any of the material facts supporting their claims were undisputed. She also argued that Michigan law established that pedophiles are likely to reoffend and, for that reason, Theresa's statements that McNabb posed a current danger to children were true as a matter of law. Additionally, Theresa argued that summary disposition would be inappropriate because discovery had not been completed, in part because in his deposition McNabb refused to answer 57 questions, which gave rise to adverse inferences that created a question of material fact.[2] Besides that, Theresa argued that her statements could be found to be true. She explained that her statement that McNabb was a pedophile could be found to be true because McNabb was convicted of a sex act with a 15-year-old. Theresa argued too that McNabb was a limited-purpose public figure because he was licensed by the state.[3]

In making its decision, the trial court recognized that a statement is not defamatory unless it tended to lower a person's reputation in the community, and deterred persons from dealing with that individual. The statement also had to be one that could be reasonably interpreted as a statement of an actual fact. The court agreed that plaintiffs had established a real and imminent danger that Theresa's remarks would damage their reputations. Her comments, the court explained, were more than "just hyperbole," and amounted to harassment; Theresa was not just engaging in advocacy. Instead, the statements were harassing plaintiffs over their status and continued operations, recognizing that Theresa was trying to "rally the troops" against McNabb and Redmond for hiring him. The court cited Theresa's statement that she wanted to inform the public about what happened to Charles after he died. The court found that this statement showed that Theresa was implying that something had in fact happened to Charles's body when read in context with the next statement about sodomizing his customers' children. The court concluded that the statements that McNabb "hunts" in various places thanks to Redmond amounted to an assertion that McNabb's behaviors were "ongoing," and that Redmond fostered that behavior, without any substantiation or proof. The court also rejected the notion that the registry could be used to call for others to attack or ostracize a person—it was merely a tool to promote vigilance.

---

[1] Paul responded to plaintiffs' motion for summary disposition, and moved for summary disposition on his own behalf, arguing that the undisputed evidence showed that he did not engage in any of the behaviors about which plaintiffs complained. Plaintiffs did not oppose the motion, and the trial court entered a stipulated order dismissing the claims against Paul, and vacating the preliminary injunction against him.

[2] Theresa moved to compel discovery based on McNabb's refusal to answer numerous questions at his deposition without the assertion of a valid privilege, but the trial court determined that the details relative to McNabb's 2005 conviction were not relevant, and denied the motion to compel.

[3] Dennis also opposed plaintiffs' motion for partial summary disposition, arguing that anything he said was protected, and there were questions of fact regarding an incident at the funeral home when he confronted Redmond.

The court determined that a permanent injunction against Theresa would be appropriate because the limitations on her were substantially outweighed by the danger of harm to plaintiffs.

As a result, the trial court entered an order granting plaintiffs' motion for partial summary disposition as to Theresa on September 17, 2018,[4] and entered a judgment and permanent injunction against Theresa providing that:

> 1.    Defendant Theresa Heller and her representatives and those acting in concert with her are restrained from speaking, delivering, publishing, emailing or disseminating information in any manner regarding Arthur McNabb's sex offender status, his address and employment status to anyone anywhere.
>
> 2.    Defendant Theresa Heller and her representatives and those acting in concert with her are hereby enjoined and restrained from defaming, stalking, harassing the plaintiffs, in any manner whatsoever, including through postings on the internet, as well as though unconsented contact with any of the plaintiffs.[5]

In February 2019, plaintiffs moved to show cause why Theresa should not be held in contempt of court for posting messages on her Facebook account along with a link to court documents, such as transcripts, that she put on her Google drive. Theresa labeled the transcripts "pedophile deposition" and "dirty Martha," and wrote that this "man can be licensed as a Mortician in Michigan," and it was a disgrace. She closed with "Pure Filth Michigan." Plaintiffs argued that these posts violated the permanent injunction.

At the ensuing hearing on the motion to show cause, the trial court expressed concern that Theresa was going to do "whatever she can to shed a bad light" on plaintiffs, yet in the end chose not to find Theresa in contempt.

## III. ANALYSIS

### A. THERESA'S MOTION FOR SUMMARY DISPOSITION[6]

Theresa argues that the trial court erred when it denied her motion for summary disposition because (1) all of plaintiffs' claims were untimely, (2) MCL 28.730 did not apply to her, (3) her report to LARA was absolutely privileged, and (4) plaintiffs failed to state a claim in their amended complaint.

---

[4] After a hearing, the trial court dismissed Dennis's counterclaim based on his lack of participation in the case and failure to show for his deposition.

[5] The trial court entered an order granting plaintiffs' motion for summary disposition as to Dennis on January 17, 2019, and entered a judgment and permanent injunction against Dennis with the same terms as applied to Theresa.

[6] Our decision regarding Theresa's claims and the injunction entered against her apply with equal force to Dennis.

Generally, to preserve a claim of error for appellate review, the party claiming the error must raise the issue in the trial court. *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Here, Theresa preserved her claims of error regarding the trial court's denial of her motion for summary disposition on the grounds that the claims were untimely, and because MCL 28.730 does not apply to her.

Theresa did not, however, at any point move to dismiss plaintiffs' abuse of process claim. Although she preserved the argument that the trial court abused its discretion when it granted the motion to amend the complaint to *add* the abuse of process claim, she did not preserve the argument that the trial court should have dismissed the new count raised in the amended complaint under MCR 2.116(C)(8) or (C)(10). Although we have the discretion to consider arguments that were not properly preserved for appellate review, we are under no obligation to do so. *Id*. Whether to dismiss the abuse of process claim should be first addressed in the trial court, where the parties would have the opportunity to develop the record and otherwise litigate the allegations. See *Napier v Jacobs*, 429 Mich 222, 228-229; 414 NW2d 862 (1987).[7]

## 1. MOOTNESS

As a preliminary matter, plaintiffs argue that this Court should not address Theresa's challenge to the trial court's order denying her motion for summary disposition because any alleged error is moot. See, e.g., *Barrow v Detroit Election Comm*, 305 Mich App 649, 659; 854 NW2d 489 (2014) (stating that an issue is moot when an event has occurred that makes it impossible for this Court to grant relief). Specifically, plaintiffs maintain that, because they voluntarily dismissed their claims for damages after they obtained injunctive relief, even if this Court were to conclude that the trial court erred when it denied Theresa's motion for summary disposition, this Court could not grant relief because there are no claims left to dismiss.

However, as Theresa correctly notes, an injunction is a remedy, not an independent cause of action. See *Terlecki v Stewart*, 278 Mich App 644, 663; 754 NW2d 899 (2008). Because a remedy must be supported by an underlying cause of action, the trial court could not enter an injunction premised on untimely claims. See *id.* at 663-664 (stating that equitable relief was unavailable to the plaintiffs because all their claims had been dismissed). In fact, the trial court granted plaintiffs' motion for summary disposition, and entered a judgment providing plaintiffs with injunctive relief after it determined that plaintiffs had established that Theresa defamed Redmond, McNabb, and Redmond Funeral Home. Consequently, were we to conclude that the trial court should have dismissed plaintiffs' claims, then reversal of the trial court's judgment and order would have to ensue. Review of the trial court's order is not moot.

## 2. PERIOD OF LIMITATIONS

The Legislature has prohibited a person from bringing "an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone

---

[7] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority[.]" *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

through whom the plaintiff claims, the action is commenced within" the applicable period of limitations. MCL 600.5805(1). "The period of limitations is 1 year for an action charging libel or slander." MCL 600.5805(11). A claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damage results." MCL 600.5827.

Contrary to Theresa's arguments that the period of limitations for defamatory statements begins to run after the first defamatory statement, and that merely repeating the defamatory statement does not extend the period of limitations, the Supreme Court long ago recognized that each publication of a libelous or slanderous statement was independently actionable. See *Leonard v Pope*, 27 Mich 145 (1873). In *Leonard*, the Court held that a plaintiff could bring a separate action against a publisher for each printed newspaper containing the allegedly libelous statement delivered to subscribers. *Id.* at 149-150. Since *Leonard*, Michigan courts have continued to recognize that each act amounting to libel or slander could serve as a separate claim subject to a separate period of limitations, or could be joined in one action. See *Grist v Upjohn Co*, 1 Mich App 72, 85; 134 NW2d 358 (1965); *Brewer v Chase*, 121 Mich 526, 529; 80 NW 575 (1899) (agreeing with authorities that state that every repetition is a fresh defamation); see also 2 Restatement Torts, 2d, § 577A, p 208 (stating that normally each of several communications to a third person by the same defamer is a separate publication, but explaining that an aggregate communication is a single publication). But in either case, a plaintiff's proofs and recovery would be limited to those libels or slanders that occurred within one year of the suit. See *Grist*, 1 Mich App at 85 (stating that each slanderous act is a basis for an action, and the statute of limitations runs from the date of each such act).

Theresa's reliance on *Mitan v Campbell*, 474 Mich 21; 706 NW2d 420 (2005), is misplaced. The *Mitan* Court addressed a situation where the defendant allegedly defamed the plaintiff during a television interview that was not broadcast until some days after the interview. *Id*. at 22-23. The plaintiff sued the defendant more than one year after the interview, but within one year of the broadcast. *Id.* at 22-23. The Supreme Court had to determine whether the period of limitations began with the defamatory statement, or with the subsequent broadcast by a third party; the Court concluded that the original defamatory statement constituted the point in time when the claim accrued. *Id*. at 22. The Court explained that "republication, regardless of whether the republication was intended by the speaker," did not restart the period of limitations. *Id.* at 25. The Court, however, clarified that it was only addressing the defendant's personal liability for a statement under circumstances in which there was evidence that the defendant expected a third party to republish the defamatory statement. *Id.* at 25. The Court did not address those circumstances where the speaker repeated her defamatory statement over time, or where the speaker made separate and distinct defamatory statements over time. The sole question before the Court was whether a defendant could be held liable for a third party's republication of the defendant's statement. *Id.* at 25 n 4. Because this case does not involve republication by a third party, *Mitan* does not apply.[8]

---

[8] Plaintiffs alleged several causes of action that—although supported by the same set of facts— were distinct causes of action. See *Wilkerson v Carlo*, 101 Mich App 629, 631-632; 300 NW2d 658 (1980). For example, this Court has held that the period of limitations for libel and slander

Here, plaintiffs pleaded that Theresa's defamatory campaign began in June 2016, and pleaded discrete defamatory publications that Theresa made on specific dates. The trial court properly dismissed the one publication that Paul allegedly made more than a year before plaintiffs filed their complaint, but properly allowed the remaining allegations to continue to serve as the basis for the defamation claim because they were published less than a year prior to the filing of the complaint. The trial court properly applied *Leonard* and *Grist* to allow a single claim of defamation premised on the allegations of distinct defamatory publications that occurred within the one-year period of limitations. Consequently, it did not err when it denied Theresa's motion for summary disposition[9] under MCR 2.116(C)(7).[10]

### 3. SORA CLAIM

Persons convicted of certain specified crimes are required to register under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*, and to abide by certain conditions. See *People v Tucker*, 312 Mich App 645, 655-659; 879 NW2d 906 (2015) (discussing the history of the SORA). The information collected for the registration or report is generally confidential and

---

does not apply to a claim for false light. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 386; 689 NW2d 145 (2004). Similarly, the one-year period of limitation does not apply to a properly stated claim of intentional infliction of emotional distress, *Campos v Oldsmobile Div, Gen Motors Corp*, 71 Mich App 23, 26; 246 NW2d 352 (1976), which plaintiffs alleged in part under Count IV and again under Count VI. For each of those claims, plaintiffs alleged harms that were distinct from the harm caused to their reputations, such as fear, anxiety, and emotional distress. As such, plaintiffs' claims are distinguishable from the claim at issue in *Meyer v Hubbell*, 117 Mich App 699, 704-705; 324 NW2d 139 (1982).

[9] Theresa argues that this Court must conclude that the trial court erred because plaintiffs conceded as much by failing to oppose her argument that the trial court erred. As the appellant, Theresa has the obligation to demonstrate that the trial court erred when it denied her motion. *Beason v Beason*, 435 Mich 791, 804; 460 NW2d 207 (1990) (stating that "the burden is on the appellant to persuade the reviewing court that a mistake has been committed, failing which the appellate court may not overturn the trial court's findings."). And plaintiffs' decision not to offer an argument in support of the trial court's decision does not bind us to a conclusion that the trial court erred. See *Int'l Text-Book Co v Marvin*, 166 Mich 660, 666; 132 NW 437 (1911) ("No argument is made in the brief for the appellee to support the rulings admitting testimony, the charge of the court, or the theory according to which the issue of fact was left with the jury. Nevertheless, we must sustain the judgment if no error occurred at the trial.").

[10] Theresa spends a significant amount of time discussing continuing wrongs. However, the continuing wrongs doctrine has no application to claims involving discrete and separate tortious acts or omissions. For example, this Court has held that a plaintiff can allege a malpractice claim premised on discrete acts or omissions that constitute separate breaches of the duty owed, even when the acts or omissions lead to a single injury, and the claims will each have independent accrual dates. See *Kincaid v Cardwell*, 300 Mich App 513, 525; 834 NW2d 122 (2013). Similarly, as already stated, each defamatory statement can support an independent cause of action with its own accrual date. See *Grist*, 1 Mich App at 85.

exempt from disclosure except for law enforcement purposes. See MCL 28.730(1). As a means to enforce this confidentiality, the Legislature made it a misdemeanor to publish "nonpublic information concerning the registration or report," MCL 28.730(4), and provided an individual whose registration or report is revealed in violation of the SORA with a cause of action against the person who unlawfully revealed the registration or report. See MCL 28.730(5).

Although registration information was originally confidential, the Legislature has subsequently required the department to maintain a public Internet website containing listed information on each individual registered under the act. See MCL 28.728(2). It also provides that the cause of action provided under MCL 28.730(5) did not apply to information disclosed from the public Internet website required under MCL 28.728(2). MCL 28.730(6).

Theresa argues that the trial court should have dismissed Count I, which alleged a claim under MCL 28.730(5), because her publications included information from the Internet website required under MCL 28.728(2), which exempted her from liability under MCL 28.728(6). However, Theresa's argument is premised on the notion that plaintiffs' claims are based solely on her publication of information taken from the SORA website. Although plaintiffs did allege that Theresa published information that she took from the SORA website, they repeatedly stated that their claim arose from Theresa's republication of the information from the website along with details that were not part of the website. Specifically, they alleged that Theresa publicly stated that McNabb was a pedophile who abused a corpse, and that Redmond and the funeral home facilitated his acts. They also alleged that she publicly accused Redmond of putting children at risk, that she said McNabb currently "hunts at fast food places, video gaming stores, and funeral homes," and that his preferred victims were teenaged boys. These allegations involve information—such as the claim that McNabb is presently hunting teenaged boys at a funeral home—that is not provided by the department on the website. See MCL 28.728(2) (listing the information that is to be made public on the website) and MCL 28.728(3) (prohibiting certain information from being on the website). Plaintiffs also alleged that Theresa improperly posted the information from the SORA website on Facebook. To the extent that the alleged postings included nonpublic information, plaintiffs could assert a claim under MCL 28.730(5). Therefore, the trial court did not err when it denied Theresa's motion for summary disposition of Count I because her statements were not exclusively protected by MCL 28.730(6).

## B. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY DISPOSITION

Plaintiffs moved for partial summary disposition in their favor under MCR 2.116(C)(10). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). The movant must identify the issues as to which it believes that there is no genuine issue of fact, and support the motion with evidence—affidavits, depositions, admissions, or other documents—that, if left unrebutted, would demonstrate that the moving party is entitled to judgment as a matter of law. *Id*. citing MCR 2.116(G)(5) and MCR 2.116(C)(10). If the moving party properly supports his or her motion, the burden shifts to the nonmoving party to establish that a genuine issue of material fact exists. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 370; 775 NW2d 618 (2009). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

This Court reviews de novo (1) a trial court's decision on a motion for summary disposition, *Barnard Mfg*, 285 Mich App at 369, (2) whether the trial court properly applied the constitutional standard for defamation to the undisputed facts, *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 111-112; 793 NW2d 533 (2010), (3) whether the trial court properly interpreted and applied the common law, *Roberts v Salmi*, 308 Mich App 605, 612; 866 NW2d 460 (2014), and (4) whether it properly interpreted and applied any relevant statutes, *Pransky v Falcon Group, Inc*, 311 Mich App 164, 173; 874 NW2d 367 (2015).

## 1. THE UNDERLYING CLAIM

In their motion for partial summary disposition, plaintiffs argued that there were no questions of material fact as to whether they were entitled to a permanent injunction. As discussed above, an injunction is a remedy, not a cause of action. See *Terlecki*, 278 Mich App at 663. To be sure, Michigan courts have recognized that a person may in certain circumstances go to a court sitting in equity and establish a right to have another enjoined from a threatened tort. See *Adkins v Thomas Solvent Co*, 440 Mich 293, 315; 487 NW2d 715 (1992); see also *Nat'l Concessions, Inc v Nat'l Circus Corps*, 347 Mich 335, 339; 79 NW2d 910 (1956) (stating that a court sitting in equity could consider a claim asking for an injunction involving a potential breach of contract when a judgment would be worthless because the defendant was uncollectible). Nevertheless, "[i]n both law and equity, however, there must be a cognizable claim of a substantive interest invaded or threatened." *Adkins*, 440 Mich at 315. Hence, to obtain injunctive relief, plaintiffs first had to establish success on the merits of at least one claim that could support injunctive relief. The underlying claim that the trial court based the injunction upon was defamation.

There was no jury trial, because the trial court granted summary disposition on the defamation claim, determining that plaintiffs established their claim for defamation as a matter of law. If the trial court was correct, then on that basis it could enter an injunction prohibiting Theresa from repeating the statements adjudicated to be false and defamatory.

As the moving parties, plaintiffs had the burden to show that there was no material factual dispute concerning the elements of their defamation claim, i.e., that Theresa (1) made a false and defamatory statement about plaintiffs, (2) that she was not privileged to make and communicated it to a third party, (3) that she published the communication with fault amounting to, at the least, negligence, and (4) that the statement was actionable without regard to special harm (defamation per se), or that plaintiffs suffered special harm. See *Smith*, 487 Mich at 113.[11]

---

[11] Theresa argues that plaintiffs must prove actual malice because plaintiffs are limited-purpose public figures. A limited-purpose public figure is a person who has thrust himself or herself to the forefront of a particular public controversy in order to influence the resolution of the issues involved. *Hayes v Booth Newspapers, Inc*, 97 Mich App 758, 774; 295 NW2d 858 (1980). Nothing in the record suggests that plaintiffs voluntarily thrust themselves into any public controversy. Merely holding a state professional license does not transform the license holder into a public figure with regard to any issue involving that profession. *New Franklin Enterprises v Sabo*, 192 Mich App 219, 222; 480 NW2d 326 (1991) (stating that a private person does not

In their amended complaint and their motion for summary disposition, plaintiffs identified several statements by Theresa that they claimed were false and defamatory. Specifically, in the trial court's decision it cited to plaintiffs' evidence that (1) on April 22, 2017, Theresa stated that she wanted "to spread the word about what happened to Charlie after he left us two summers ago," (2) on July 24, 2017, Theresa posted on Facebook that her son's "cousins and all his friends were exposed to this pervert at Charlie's funeral," and that "he didn't sodomize his customers' children? Some of your kids were at Charlie's funeral. How does that make you feel?", (3) on that same date she stated that McNabb "hunts at fast food places, video and gaming stores, and funeral homes", and (4) on August 13, 2017, Wolf published on the Internet that McNabb "targets young teenage boys who like video games and nice shirts." Plaintiffs also set forth specific allegations and evidence about the frequency of these and other statements, Theresa continually contacting the funeral home and police agencies, and other allegedly harassing behavior.

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Smith*, 487 Mich at 113 (quotation marks and citation omitted). Upon review of the evidence submitted to the trial court, we conclude that as to the four statements listed above, no reasonable juror could conclude other than that the statements Theresa and Wolf posted to social media were defamatory. As noted above, Theresa asserted that McNabb "hunts" and "targets" young boys for sexual purposes at fast food places, videogame stores, and funeral homes, with the statements written as if he was currently doing so. Theresa also wrote that McNabb sodomized customers of Redmond Funeral Homes, and that young boys at Charlie's funeral and visitation were "exposed" to, and possibly sodomized by, McNabb. Finally, she also indicated that Redmond and Redmond Funeral Home were lying about McNabb, trying to suppress her efforts to get the warning out, and were covering up for a pedophile.

Contrary to Theresa's contention, she did not couch these accusations as opinions and, even if she had, they clearly implied an assertion of fact that could be proven false. See *Ghanam v Does*, 303 Mich App 522, 545; 845 NW2d 128 (2014). A reasonable fact-finder reading these statements could only conclude that Theresa was asserting that she had knowledge that McNabb was actively and presently hunting for teenaged boys in order to commit criminal sexual conduct, and that he was doing so at Redmond's funeral home with Redmond's knowledge and support. See *Smith*, 487 Mich at 128 (stating that the dispositive question was whether a reasonable fact-finder could find that the statement implied a defamatory meaning). Accusations of criminal sexual conduct are heinous and amount to defamation per se. *Lakin v Rund*, 318 Mich App 127, 138; 896 NW2d 76 (2016) (stating that an accusation of a crime involving moral turpitude or an infamous punishment are defamatory per se). No reasonable fact-finder could conclude other than that these statements would so harm plaintiffs' reputation so as to lower them in the estimation of

_____

become a public figure merely by becoming involved in or associated with matters of public concern). On this record, plaintiffs are private persons and, for that reason, need only prove that Theresa acted negligently when she made the statements at issue. *Deitz v Wometco West Mich TV*, 160 Mich App 367, 375; 407 NW2d 649 (1987).

the community, and deter third persons from associating or dealing with them. *Smith*, 487 Mich at 128.[12]

On appeal, Theresa argues that her statements that McNabb is a pedophile are true because he has a 2006 conviction of criminal sexual conduct involving a 15-year-old boy. She also asserts, as we noted when discussing plaintiffs' SORA claim, that everything she stated came from police reports or the website maintained under the SORA, and is therefore true. However, all of the documents she cites describe acts that occurred more than 10 years earlier—none of the reports or documents she cites involve present activity. As already noted, Theresa's social media posts were not confined to relating details from past events; she explicitly and implicitly asserted that she had actual knowledge that McNabb had continued to violate the law consistent with her belief that sex offenders always reoffend, and that Redmond was facilitating his activities. Instead, each of the statements at issue relate to present time, and were assertions of supposed fact about plaintiffs' current activities. For that reason, evidence as to what is contained on the registry or in police reports is not evidence creating a material issue of fact that her statements were true.[13]

We recognize, as did the trial court, that not all accusations of criminal conduct amount to an assertion of fact. Some statements may amount to rhetorical hyperbole, imaginative expressions, or exaggerations designed to be offensive. See *Ghanam*, 303 Mich App at 545-546. Such statements must be examined in context to determine whether a reasonable reader might understand that the writer used the terms to express strong disapproval rather than an accusation of actual criminal activity. *Id.* at 546-547. As this Court has recognized, ordinary consumers of social media generally understand that statements made in online fora are frequently not intended as assertions of fact even when framed as assertions of fact. *Id.*

Except for the statements noted above, the remainder of Theresa's statements were strongly worded, and suggested that McNabb posed an imminent danger to children. The nature of the remarks might justify a reasonable fact-finder in finding that Theresa's remarks were defamatory,

---

[12] Contrary to Theresa's argument, a speaker's motive and intent in making a statement are not elements of common-law defamation; rather, plaintiffs need only show that Theresa negligently made a false and defamatory statement. See *Mich Microtech, Inc v Federated Publications, Inc*, 187 Mich App 178, 183; 466 NW2d 717 (1991) (stating that intent in not an element of defamation); *Deitz*, 160 Mich App at 375 (stating that the common-law definition of malice involving ill will or spite no longer applies to defamation claims—the plaintiff need only prove ordinary negligence).

[13] In MCL 28.721a, the Legislature stated its determination that "a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." This legislative policy does not provide private citizens with the unfettered right to assume that all convicted sex offenders were in fact reoffending and, on the basis of that assumption, publicize false accusations of criminal conduct. The same is true of the court decisions that Theresa cites, as they do not stand for the proposition that private persons may make false and defamatory statements about a sex offender's current conduct on the basis of the sex offender's past conduct.

or that Theresa was merely expressing her strong belief that a convicted sex offender should not be employed at a funeral home. In other words, a reasonable fact-finder could find that these remaining statements, which were undoubtedly offensive to ordinary sensibilities, were nevertheless hyperbolic, or amounted to exaggerated commentary. Consequently, on those statements, there was a question of material fact as to whether the statements were defamatory, which precluded the trial court from granting plaintiffs' motion for summary disposition in its entirety. See *Ireland v Edwards*, 230 Mich App 607, 619-620; 584 NW2d 632 (1998) (stating that a trial court may determine that a statement is not capable of defamatory meaning as a matter of law, but may not grant summary disposition on that basis if the statement is capable of a defamatory meaning). In the end, however, it matters little since the four statements analyzed above were defamatory as a matter of law, and are sufficient to support a more narrowly tailored injunction.

## 2. AUTHORITY TO ENJOIN SPEECH

The First Amendment to the United States Constitution prohibits Congress—and now the States[14]—from "abridging the freedom of speech." US Const, Am I. To protect this venerable right, state and federal courts have held that prior restraints on constitutionally protected speech are prohibited. In *TM v MZ*, 326 Mich App 227, 237-238; 926 NW2d 900 (2018), our Court recently articulated the applicable First Amendment rules as follows:

> "The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.' " *Virginia v Black*, 538 US 343, 358; 123 S Ct 1536; 155 L Ed 2d 535 (2003), quoting US Const, Am I. "The United States Supreme Court has held that the federal constitution protects speech over the Internet to the same extent as speech over other media." *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 256, 833 NW2d 331 (2013), citing *Reno v American Civil Liberties Union*, 521 US 844, 870; 117 S Ct 2329; 138 L Ed 2d 874 (1997). However, the "right to speak freely is not absolute." *Cooley*, 300 Mich App at 256, [] citing *Chaplinsky v New Hampshire*, 315 US 568, 571; 62 S Ct 766; 86 L Ed 1031 (1942). For example, "[l]ibelous utterances [are] not . . . within the area of constitutionally protected speech," and a state may therefore enact laws punishing them. *Beauharnais v Illinois*, 343 US 250, 266; 72 S Ct 725; 96 L Ed 919 (1952).

> Prohibitions relating to content, however, are few, because of the First Amendment's "bedrock principle" that an idea cannot be prohibited "simply because society finds the idea itself offensive or disagreeable." *Texas v Johnson*, 491 US 397, 414; 109 S Ct 2533; 105 L Ed 2d 342 (1989). "The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed." *RAV v City of Saint Paul, Minnesota*, 505 US 377, 386; 112 S Ct 2538; 120 L Ed 2d 305 (1992). "The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social

---

[14] The freedom of speech guarantee was made applicable to the states by the Supreme Court in *Gitlow v New York*, 268 US 652, 666; 45 S Ct 625; 69 L Ed 1138 (1925).

value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Black*, 538 US at 358-359 (quotation marks and citation omitted). Thus, the First Amendment does not protect obscenity or defamation, within certain limits. *RAV*, 505 US at 383[.] "[A] State may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace," including "fighting words," "inciting or producing imminent lawless action," and "true threat[s]." *Black*, 538 US at 359 (quotation marks and citation omitted).

As the *TM* Court explained, there is a modern trend among some courts that recognize the ability of trial courts to enjoin specific speech that has already been determined by a finder of fact to be defamatory. *TM*, 326 Mich App at 245-246, and cases cited therein. See, also, *McCarthy v Fuller*, 810 F3d 456, 461-462 (CA 7, 2015).[15] Other courts remain steadfast that no exception can be applied consistent with the long-standing prohibition on prior restraints.[16] See, e.g., *McCarthy*, 810 F3d at 464 (SYKES, J., concurring); *Kinney v Barnes*, 443 SW3d 87, 92-99 (Tex, 2014). Here, however, because of the broad language contained in the injunctions, whether we apply the general rule prohibiting prior restraints, or the modern trend recognizing a narrow exception to that general prohibition, both injunctions as written violate defendants' First Amendment rights to free speech.

This is so because both injunctions cover certain speech that would be protected by the First Amendment. For example, Theresa could speak about whether certain criminal sexual conduct convicts should be working in funeral homes by using McNabb as an example, but relaying only the information contained in the public domain, yet be brought into court for potential contempt hearings. Additionally, Theresa could state other nondefamatory commentary about Redmond and McNabb, or engage in other undefined "harassing" behavior, and be subject to censure by the court. In other words, the injunction potentially covers much more than the specific four statements found to be defamatory, and therefore does not survive constitutional scrutiny under the general antiprior restraint law under the First Amendment, or under the narrow exception recognized by many courts.[17]

### 3. INCOMPLETE DISCOVERY

---

[15] Most of the cases adopting the modern trend are based upon a conclusion after trial (bench or jury) that the statements were defamatory. Some courts have said in dicta that even a directed verdict might not suffice, see *Kramer v Thompson*, 947 F2d 666, 679 (CA 3, 1991), while other courts have entered permanent injunctions based upon the grant of summary judgment on a defamation claim when there was no genuine issue of material fact for the jury to decide. See, e.g., *Oakley, Inc v McWilliams,* 890 F Supp 2d 1240, 1242-1243 (CD Ca, 2012), and *American Univ of Antigua College of Medicine v Woodward,* 837 F Supp 2d 686, 700-701 (ED Mich, 2011). Neither party has raised this line of cases.

[16] "Cases from other jurisdictions are not binding precedent, but we may consider them to the extent this Court finds their legal reasoning persuasive." *Auto Owners Ins Co v Seils*, 310 Mich App 132, 147 n 5; 871 NW2d 530 (2015).

[17] Consequently, like the *TM* Court, we have no reason to determine whether the modern line of reasoning should be adopted in Michigan. *TM*, 326 Mich App at 245-246.

Theresa also devotes a significant portion of her brief on appeal discussing McNabb's refusal to answer certain questions at his deposition. She complains that he refused to answer the questions without asserting a valid privilege, and argues that discovery was not sufficiently complete to permit a motion for summary disposition because McNabb failed to answer the questions. She also maintains that his failure to answer the questions should give rise to adverse inferences, which created a question of fact as to the truth of Theresa's statements.

Generally, a decision to grant summary disposition is premature if discovery has not been completed. See *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 33; 772 NW2d 801 (2009). However, summary disposition may still be appropriate before the conclusion of discovery if there is no fair likelihood that further discovery would yield support for the nonmoving party. *Id.*

In pursuing this argument, Theresa does not argue that further discovery beyond deposing McNabb would have a fair likelihood of yielding support for her position. Instead, she argues that discovery was incomplete because McNabb refused to answer questions about his misconduct from more than a decade before the events at issue. Notably, Theresa does not address the fact that the trial court ruled against her on this issue, and denied her motion to compel McNabb to testify.

At McNabb's deposition, Theresa's lawyer repeatedly asked McNabb about sexual misconduct involving the minor or other minors discussed in police reports from more than a decade earlier. For example, he asked McNabb whether he disposed of evidence before police officers interrogated him. He also asked McNabb whether he "sodomized" the "customers at GamePlaza," which was a videogame store identified by officers as a place where McNabb hung out before his conviction. And Theresa's lawyer asked McNabb questions about behaviors that could be considered grooming that were identified in the police reports.

Discovery generally applies only to matters that are "relevant to any party's claims or defenses and proportional to the needs of the case[.]" MCR 2.302(B)(1). Even when relevant to the subject matter involved, the trial court has the authority to provide that "certain matters not be inquired into," MCR 2.302(C)(4) on the ground that the proposed limitation was necessary to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," MCR 2.302(C).

At the hearing on Theresa's motion to compel discovery, the trial court specifically found that the questions about what happened in 2005 were not relevant to determining whether Theresa's statements about McNabb's activities in 2015 and 2016 were true. Theresa has not challenged the trial court's exercise of its discretion to bar Theresa from inquiring about the details of the investigation into McNabb's sexual misconduct in 2005. By failing to address the trial court's actual decision on her motion to compel, Theresa abandoned any assertion that the trial court erred when it precluded her from obtaining answers to those questions. See *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) (stating that this Court need not consider granting relief where the appellant failed to dispute the actual basis of the trial court's ruling). Consequently, because the trial court determined that she could not ask those questions, discovery was in fact complete with regard to McNabb's testimony, and Theresa has

not identified any other basis for concluding that discovery was not sufficiently complete to permit summary disposition.

## IV. CONCLUSION

The trial court's order granting plaintiff's motion for partial summary disposition is affirmed in part, and denied in part. The permanent injunctions are vacated, and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Kirsten Frank Kelly